PHINEAS W. TURNER *vs.* THE SELECTMEN OF HEBRON.

Hartford Dist., Oct. T., 1891.   ANDREWS, C. J., CARPENTER, SEY-
MOUR, TORRANCE and FENN, Js.

The plaintiff, more than twenty years before, had become the owner of all
    the land around a large pond, and had during that time had the exclu-
    sive use of it for fishing and as a reservoir for a large factory, and had
    raised the outlet so that the depth of the water was increased seven
    and a half feet, and about a third added to its area.   Held that, whether
    or not the plaintiff had acquired a title to the land under the water, he
    had acquired an exclusive right to the water of the pond.
All members of the unorganized public had, from time immemorial, fished
    in the pond whenever disposed, as a matter of right, at all seasons,
    without objection from any one, until the plaintiff became the owner
    of the land around the pond.   Held that the unorganized public could
    not as such acquire the right of fishing there, either by grant or by pre-
    scription.
If the right to fish in the pond had been acquired by long use, it would be
    a right in the nature of a *profit a prendre in alieno solo*, and would be-
    long to the individuals acquiring it in gross.   It would be a mere per-
    sonal right that could not be assigned and would not descend to heirs.
The Colonial legislature had confirmed the title deeds of the land under and
    around the pond.   Held that no public or common right of fishing re-
    mained thereafter, if such a right had ever existed.
*Primâ facie* the right to take fish in any water, other than navigable riv-
    ers, belongs to the owners of the soil over which the water flows.   This
    is because in ordinary cases the ownership of the soil carries with it
    the ownership of the water.

Whenever the ownership of water is in one person and the ownership of the soil under the water is in another, the right of fishing in the water belongs to the former, for he owns that element in which alone the fish can exist.

A several or exclusive right of fishing in the estate of another may be gained by an adverse, uninterrupted and exclusive use and enjoyment of it for the period required by the statute of limitations. In such case the one so using it acquires title to the right of fishing against all the world ; and can maintain trespass against any one, even the owner of the soil, for taking the fish.

[Argued October 6th—decided October 26th, 1891.]

APPLICATION for relief from the laying out of a highway by the defendants; brought to the Superior Court in Tolland County. The case was referred to a committee who reported the following facts.

This proceeding is based upon the lay-out of a certain highway in Hebron by the selectmen of the town, about one hundred rods in length, from an old highway leading from Hebron Green to North Pond. It runs to the low water line of the pond, and passes over an immense rock or ledge near the termination of the way. This rock is about thirteen feet higher, at the highest point, than the adjoining ground, or the high water line of the pond. It is easy of ascent, and the top affords a fine view of the pond and its surrounding scenery. It runs shelving into the deep water of the pond, and on one side affords partial protection from storms, which gives it the name of "Shelter Rock." From time immemorial this rock has been the favorite resort of picnic parties and others, from the surrounding region, near and remote, seeking recreation and pleasure, and the object of laying out the way four rods wide at its termination was to afford an opportunity to such parties, and those frequenting the pond, to secure their horses while remaining, and turn around their vehicles when leaving.

Originally North Pond was wholly a natural lake, and continued to be so down to about 1865, when the plaintiff purchased all the land adjoining the pond. He built a dam, and raised the waters of the pond seven and a half feet higher than its previous high water line. This was done to

enable him to use the water as a power to run his silk manufacturing establishment.

The pond is about one mile in length, and for a short distance is three quarters of a mile in width, and contains about one hundred and eighty-eight acres in area, when full to high water line.

A line, running north and south to an island in the pond, is the dividing line between the towns of Hebron and Lebanon. A line drawn diagonally through the north part of the pond from northeasterly to southwesterly, is called the "five-mile line." It is the northerly side of a square containing twenty-five square miles of land, which was deeded by Owaneco, the son of Uncas, the chief of the Mohegan tribe of Indians, to Samuel Mason· and others, in the year 1692.

These grantees deeded the same tract to the proprietors of the town of Lebanon in the year 1699. These deeds were confirmed by the General Court of the Colony of Connecticut, at its May session, 1705.

The proprietors of the town of Lebanon, by their committee duly authorized, conveyed the title to all of North Pond that lay within said five miles square of land, to Caleb Chapell, in the year 1730. The title descended through the son and grandsons of Caleb Chapell and others to Joshua Chapell in the year 1760, when the latter had full title to all that part of the pond that lies south and east of the five-mile line. Joshua Chapell conveyed all his right and title to the pond to Abigail Chapell Bosworth, in the year 1773.

The most diligent search of all the town probate and other records has failed to discover that the title to the pond within the five-mile square of land ever passed from the said Abigail, and so the committee find that the title never passed from her to any party or parties, but became lost and abandoned. It is true that no party has ever appeared during the past one hundred and seventeen years claiming title or any interest in this part of the pond, from or through the said Abigail; and during this long period of time, one hundred and six deeds have been given of the land contiguous

to this part of the pond, which have in every instance bounded the grantee or grantees by the shore of the pond.

The title to all the lands in the town of Hebron descended from Joshua, the son of Uncas, who devised the same to Captain John Mason in the year 1675. The General Court of the Colony confirmed the will of Joshua in 1678. Mason deeded the lands to William Whiting and others, who in turn conveyed them to the proprietors of the town of Hebron in the year 1718. The proprietors of the town, by their committee duly authorized, conveyed to Samuel Heaton, in the year 1720, a tract of land in the town, the east line of which ran across the west corner of the pond, from a point near where the five-mile line intersects with the southwest shore of the pond, to near the easterly end of Shelter Rock.

The title to the part of the pond covered by this deed descended through various parties and became vested in the plaintiff in the year 1865. The committee are not satisfied that the plaintiff owns the title to the land covered by the water of any other part of the pond, and therefore they find that his title to the same is confined to the part described; and the title to the remaining part of the pond that lies northerly of the five-mile line and west of the town of Lebanon remains in the proprietors of Hebron.

From time immemorial all members of the great unorganized public, both near the pond and remote from it, whenever and wherever disposed so to do, fished in North Pond as a matter of right, at all seasons of the year,—in boats during the spring, summer and fall, and through the ice during the winter. This was done without objection from any source whatever, down to the time when the plaintiff bought all the land adjoining the pond, when he only made complaint.

Evidence to prove these facts was objected to by the plaintiff, on the ground that no prescriptive title in the public to the pond could be acquired by the individual acts of its members, no matter how long they may have been continued or whatever may have been their character. The committee ruled that the objection was well taken, but admitted the evidence as

tending to prove to some extent that the plaintiff had no title to the pond, either by prescription, as he claimed, during the last twenty years, or otherwise.

The defendants offered in evidence the declarations of aged deceased persons, that they, and their deceased fathers, fished in the pond at all seasons of the year, whenever so disposed. The plaintiff objected to this evidence, but the committee received it on the same ground as the other.

When the plaintiff became the owner of all the land surrounding the pond, he posted notices forbidding all persons fishing in it, and on one occasion drove a party with force from the pond, whom he found fishing there. He sought to prevent all persons fishing in the pond without leave, and did so as far as it was within his power. At one time he spent $100 stocking the pond with fish. His objection to fishing was not on account of the value of the fish, for he freely gave permission to fish whenever requested, but through fear that the public might acquire the right by prescription to fish.

The plaintiff's principal objection to the proposed road is, that large parties of persons from the town of Hebron and elsewhere will frequent Shelter Rock on Sundays; that they will take spirituous liquors with them, and many of them will become intoxicated and desecrate the Sabbath; that the morals of his one hundred and twenty employees in his manufacturing establishments would become corrupted, and that the result would be that his business would suffer in consequence of intemperate and inefficient laborers.

If, on these facts, the law is so that all members of the unorganized public have the right, as against the plaintiff, to fish in North Pond, except the part owned by the plaintiff as aforesaid, then the committee are of the opinion, and find, that the laid-out way is of common convenience and necessity. But if, on these facts, the law is otherwise, then the committee are of the opinion, and find, that the laid-out way is not of common convenience and necessity.

The plaintiff remonstrated against the acceptance of the report of the committee, on the ground that they erred in

admitting evidence that members of the great unorganized public fished in the pond, and evidence of the declarations of aged deceased persons that they and their deceased fathers fished there. But the court, (*F. B. Hall, J.*,) overruled the remonstrance and accepted the report, and rendered judgment for the defendants. The plaintiff appealed.

*C. E. Perkins* and *S. Lucas*, for the appellant.*

*J. R. Buck* and *A. F. Eggleston*, with whom was *C. Phelps*, for the appellees.

1. From the report of the committee it appears that the pond may be divided into three parts:—1st. That which is east and south of the five-mile line. This was the Caleb Chapell property. 2d. That part which is situated west of the five-mile line, except so much thereof as is included within the lines described in the Heaton deed. 3d. The southwest corner of the pond, which includes the outlet, and which came to Turner from the proprietors through Samuel Heaton, to whom this part of the pond was deeded in 1720. The Caleb Chapell property is the largest part of the pond, and starts with the title of the five-mile square, of which it forms a part. This title came from Owaneco, son of Uncas, to Samuel Mason and others in 1692. In 1699 these grantees deeded this tract to the proprietors of the town of Lebanon, and these deeds were confirmed by the general court of the colony of Connecticut. These proprietors conveyed the land covered by the water within the five-mile square to Caleb Chapell in 1730. It finally came to Abigail Chapell Bosworth in the year 1773. From her the title never passed; it became extinct with her name. The committee find that " the most diligent search of all the town, probate and other records has failed to discover that the title to the pond within the five-mile square ever passed

---

* The points made by the counsel for the appellant were sustained by the court, and are fully stated in the opinion.

from Abigail Bosworth, and so the committee find that the title never passed from her to any party or parties, but the same became lost and abandoned." This land, being "lost and abandoned" land, may be used in its present state by what the committee call the "unorganized public." They trespass on nobody's land when they sail or row over the waters or fish in them. And the public may cut ice there without committing any crime or misdemeanor, until the state sees fit to regulate it by statute. Section 647 of Gen. Statutes provides that "when no owner of any estate can be found, it shall escheat to the state." This land has therefore escheated to the state, and only awaits certain statutory proceedings, which are provided for, in order to make a public record of the fact. The title to that part of the pond lying west of the line between Lebanon and Hebron, except a small area near the outlet covered by the Heaton deed, came from Joshua, son of Uncas, through Captain Mason and William Whitney, to the proprietors of the town of Hebron. The committee finds that this tract "remains in the proprietors of the defendant town." From this it appears that those persons who have been accustomed to frequent this part of the pond for fishing and boating purposes have committed no trespass, because the original proprietors of the defendant town have had no existence, either as natural persons or as an organized body, for more than a hundred years, and were probably merged in the town of Hebron, May 8, 1707, when they petitioned the Colonial Assembly to be made the town of Hebron, their petition being granted. If this part of the pond does not belong to the town of Hebron, it has undoubtedly escheated to the state, as in the case of the Caleb Chapell property. As to the remainder of the pond, which is included in the Heaton deed and is near the outlet, the committee find that the land covered by the water of this part of it became vested in the plaintiff in the year 1865. This is the only portion of the pond which Turner can control, as this is the only portion of it which he owns. The proposed highway is laid out so as to enable persons going on to the other parts of

the pond to do so without going over this part of it or interfering with it in any way.

2. The committee has found that the proposed highway is of " common convenience and necessity." After describing the land conveyed by the Heaton deed the report finds as follows:—" The committee are not satisfied that the plaintiff owns the title to the land covered by the waters of any other part of the pond, and therefore they find that his title to the same is confined to the part described." Also that, "from time immemorial all members of the great unorganized public, both near the pond and remote from it, whenever and wherever disposed so to do, fished in North Pond as a matter of right at all seasons of the year, in boats during the spring, summer and fall, and through the ice during the winter." And also that " if the law is so that all members of the unorganized public have the right, as against the plaintiff, to fish in North Pond, except the part owned by the plaintiff, then the committee are of opinion and find that the laid-out way is of common convenience and necessity." According to this finding Turner is not the owner of any part of the pond except the southwest corner, and the new road does not touch that. The committee also say that if the public can fish in the other parts of the pond as against Turner, then the highway is of common convenience and necessity. Turner could not prevent fishing in the other parts of the pond, because he does not own any part of it, except the small portion which the committee finds became vested in him in 1865. How can he object to fishing in the waters which cover land not owned by him? In order for the court to decide that this proposed highway comes within the statutory requirement of being a highway of common convenience and necessity, it is only necessary to hold that Turner could not prevent any person from fishing in those parts of the pond which he does not own.

3. Deeds bounding on the shore of an inland lake or pond convey title only to the shore. There are numerous authorities upon this point, but the principle is as well stated in Angell on Water Courses, (5th ed.) 41, as by any authority

which. we have consulted. His' language is as follows:—
" When land is conveyed bounding upon a lake or pond, if
it is a natural pond, the grant extends only to the water's
edge ; but if it is an artificial pond, like a mill pond, caused
by the flowing back of the water of a river, the grant ex-
tends to the middle of the stream in its natural state." This
is the law of Connecticut. *Mill River Woolen Manuf. Co.* v.
*Smith*, 34 Conn., 462. Also of Massachusetts. *Waterman* v.
*Johnson*, 13 Pick., 261; *Paine* v. *Wood*, 108 Mass., 160. Also
of Vermont. *Fletcher* v. *Phelps*, 28 Verm., 257. Also of New
Hampshire. *State* v. *Gilmanton*, 9 N. Hamp., 461. And of
Maine. *Bradley* v. *Rice*, 13 Maine, 201. See also, *Hathorn*
v. *Stinson*, 10 Maine, 224, 238 ; *Wood* v. *Kelley*, 30 id., 47, 54 ;
*Mansur* v. *Blake*, 62 id., 38. It is also the law of New York.
*Canal Commissioners* v. *The People*, 5 Wendell, 423 ; *Wheel-
er* v. *Spinola*, 54 N. York, 378 ; *Smith* v. *Rochester*, 92 id.,
463 ; *Gouverneur* v. *National Ice Co.*, 25 Abbott's New
Cases, 276 ; *Child* v. *Starr*, 4 Hill, 369 ; *Kingman* v. *Sparrow*,
12 Barb., 201 ; *Champlain & St. Lawrence R. R. Co.* v.
*Valentine*, 19 id., 484; *Ledyard* v. *Ten Eyck*, 36 id., 102.
See also 3 Washburn on Real Prop., (5th ed.,) 443, § 47 ;
Gould on Waters, 203 ; Angell on Water Courses, (5th ed.)
42. From all these authorities the conclusion seems irre-
sistible, that deeds of land bounding on the shore of an
inland lake or natural pond, give title only to the water's
edge, leaving the land covered by the water unaffected by the
deed.

4. In the second reason of appeal it is claimed that a por-
tion of the proposed road was laid out for a picnic ground.
The report says only that a certain rock near the termina-
tion of the road was much resorted to by pleasure parties,
and that it was laid out four rods wide near the pond to en-
able them to secure their horses while remaining and to turn
round their vehicles when leaving. A highway may be laid
out even for pleasure driving. In *Bryan* v. *Town of Branford*,
50 Conn., 254, LOOMIS, J. says: " As the traveler for pleasure
or recreation has his rights in the use of a road when made, so
his voice may unite with others in making a public demand

for a new road." See also· *Higginson* v. *Nahant*, 11 Allen, 530; *Smith* v. *City of Rochester*, 92 N. York, 478.

5. At the hearing before the committee evidence was offered by the defendant to prove that the public had been accustomed to fish in the pond, from time immemorial, as a matter of right, which evidence included the declarations of aged deceased persons that they and their deceased fathers fished in the pond at all seasons of the year, whenever so disposed  In admitting this evidence the committee followed the rule established by this court in the case of *Merwin* v. *Wheeler*, 41 Conn., 24.

6. In the sixth and seventh reasons of appeal it is claimed that the " unorganized public " as an entity could not have the right of fishing in the pond. The committee in their finding do not treat the unorganized public as an entity at all. What they say after finding the essential facts is—" if on these facts the law is so that all members of the unorganized public have the right as against the plaintiff to fish in North Pond, except the part owned by the plaintiff as aforesaid, then the committee are of the opinion and find that the lay-out is of common convenience and necessity." That is to say, if Turner cannot prevent persons going over this highway to the pond, from fishing in that part of it not owned by him after they get there, then the highway is of common convenience and necessity.

ANDREWS, C. J.  On the 16th day of May, 1888, the selectmen of the town of Hebron laid out a public highway in that town over the land of Phineas W. Turner, which lay-out was accepted by the town at a town meeting holden on the 6th day of June following.  On the 2d day of July Mr. Turner made application for relief, in the nature of an appeal from the doings of the selectmen in laying out the highway, to the Superior Court in Tolland County, alleging as a reason for the application that the highway was not of common convenience and necessity.  In the Superior Court a committee was appointed pursuant to the statute—(Gen. Statutes, § 2701,) to hear and determine the application and

to make report thereon. The committee heard the parties and made their report to the court. Mr. Turner remonstrated against the acceptance of the report, but the court overruled the remonstrance, accepted the report, and dismissed the application of Mr. Turner with costs. From that judgment he now appeals to this court, and assigns various reasons of appeal.

The statute above cited provides that "if said committee shall find that the highway is not of common convenience and necessity * * * said court shall set aside such lay-out thereof; but if they shall find that such highway is of common convenience and necessity * * * the application shall be dismissed with costs."

The committee, after setting forth the facts at some length, concluded their report in these words:—"If, on these facts, the law is so that all members of the unorganized public have the right as against the plaintiff to fish in North Pond, except the part owned by the plaintiff as aforesaid, then the committee are of opinion and find that the laid-out way is of common convenience and necessity. But if on these facts the law is otherwise, then the committee are of opinion and find that the laid-out way is not of common convenience and necessity."

The only question we propose to consider is, whether or not the law is so on the facts stated that all members of the unorganized public have the right, as against Mr. Turner, to fish in said pond.

North Pond is a natural pond, situated in the towns of Hebron and Lebanon. By deeds which were confirmed by the Colonial legislature the title to the pond and the soil beneath it became vested in the proprietors of said towns; much the larger part in the proprietors of the town of Lebanon. This part by sundry conveyances came to Abigail Bosworth in the year 1773. There is no record on the town records, or probate records, or other record, that the title to this land ever passed from said Abigail; and so the committee find that the title to said land "never passed from said Abigail Bosworth to any party or parties, but the

same has become lost and abandoned." Of that part which once belonged to the proprietors of Hebron a portion has come and now belongs to Mr. Turner, and the remainder, so far as the records disclose the title, still belongs to that town, or to the representatives of the proprietors.

In 1865 the plaintiff became the owner of all the land surrounding the pond. He raised the dam at the outlet so much that he thereby raised the water of the pond seven and a half feet. The present area of the pond is one hundred and eight acres, of which more than one fourth is caused by such raising of its water. The plaintiff applied the water of the pond to use in manufacturing, in which he employs one hundred and twenty persons. Prior to the time when the plaintiff so became owner, and in the words of the finding, "from time immemorial, all members of the great unorganized public, both near the pond and remote from it, whenever and wherever disposed so to do, fished in North Pond as a matter of right, at all seasons of the year, in boats during the spring, summer and fall, and through the ice during the winter. This was done without objection from any source whatever down to the time when the plaintiff bought all the land adjoining the pond. * * * When the plaintiff became the owner of all the land surrounding and adjoining the pond, he posted notices forbidding all persons fishing in the same, and on one occasion he drove a party with force and arms from the pond whom he found fishing there. He sought to prevent all persons fishing in the pond without his leave, and did so as far as it was within his power. * * * At one time he spent the sum of one hundred dollars stocking the pond with fish. His objection to fishing was not on account of the value of the fish, for he freely gave permission to fish whenever requested, but through fear that the public might acquire the right by prescription to fish there."

These facts, while they may not be sufficient to show that the plaintiff has acquired title to the soil under the original pond, do show that he has acquired the right to keep that soil covered with water. The easement of flowing he owns,

and so he owns the water. *Mill River Woolen Manufacturing Co.* v. *Smith*, 34 Conn., 462. These facts also show that the plaintiff, as such owner of the water and of the land surrounding the water, had been for more than twenty years in the actual, exclusive and uninterrupted possession and occupation of the right of fishing in the entire pond, claiming it as his own and keeping all others away. There is no evidence that since 1865 any person whatever has succeeded in fishing in that pond, except he did it by the permission of the plaintiff. Whoever has attempted to fish there without such permission has been driven away.

By the action of the Colonial legislature in confirming the title deeds of the land under and around North Pond, no public or common right of fishing therein remained, if such a right had ever existed. *Smith* v. *Miller*, 5 Mason, 191; *Adams* v. *Pease*, 2 Conn., 481. Nor could the unorganized public, as such, acquire the right of fishing there either by grant or prescription. A deed or devise to the unorganized public by that name would be void for uncertainty. And there can be no prescription where there can be no grant. *Merwin* v. *Wheeler*, 41 Conn., 23; *Pearsall* v. *Post*, 22 Wend., 425; Washburn on Easements, 119; *Rogers* v. *Brenton*, 10 Q. Bench, 26. Doubtless any member, or each member, of the unorganized public might obtain the right of fishing in that pond in either of the ways mentioned. There is no suggestion of any grant. The right which the committee say was exercised by all the members of the great unorganized public was " to fish in the pond at all seasons of the year, in boats during the spring, summer and fall, and through the ice in the winter." If the right so exercised had been completely acquired by long use it would be a right in the nature of a *profit a prendre in alieno solo*, and must have belonged to each member in gross. The facts show that the right was not exercised as appurtenant to a freehold. Such a right is a mere personal one; it cannot be assigned and it does not descend to heirs.

We are not, however, interested so much to discuss what right of fishing in North Pond the unorganized public may

have had in 1865, as to ascertain what right of fishing in that pond Mr. Turner did in fact have in 1888.

*Primâ facie* the right to take fish in any water other than navigable rivers belongs to the owner of the soil over which the water flows. This is because in ordinary cases the ownership of the soil carries with it the ownership of the water. But the ownership of the water may be separated from the ownership of the soil, and where this is done the right of fishing goes with the ownership of the water. The law is stated in Coke Littleton, 4 b:—" If a man be seized of a river and by deed do grant *separatam piscariam* in the same, and maketh livery of seizin *secundum formam chartæ*, the soil doth not pass, nor the water, for the grantor may take water there, and if the river become dry he may take the benefit of the soil, for there passeth to the grantee but a particular right, and the livery being made *secundum formam chartæ* cannot enlarge the grant. For the same reason, if a man grant *aquam suam*, the soil shall not pass, but the piscary within the water passeth therewith." See also Comyn's Digest, *Grant, E.,* 5 ; *Jackson* v. *Halstead,* 5 Cowen, 216.

Whenever the ownership of water is in one person and the ownership of the soil under the water is in another, the right of fishing in the water belongs to the former; for he owns that element in which alone the fish can exist. Mr. Turner being the owner of the water of North Pond, was the owner of the right of fishing therein. Coke Litt., 5 b.

A several or exclusive right of fishing in the estate of another may also be gained by an adverse, uninterrupted and exclusive use and enjoyment of it for the period required by the statute of limitations. 2 Washburn's Real Property, (4th ed.,) 366 ; *Tinicum Fishing Co.* v. *Carter,* 61 Penn. St., 21. In such case the one so using it acquires title to the right of fishing against all the world. *Chalker* v. *Dickinson,* 1 Conn., 382 ; *Church* v. *Meeker,* 34 Conn., 421 ; *Preble* v. *Brown,* 47 Maine, 284 ; 3 Kent's Com., 43. And can maintain trespass against any one, even the owner of the soil, for taking the fish. *Adams* v. *Pease,* 2 Conn., 481 ;

*Smith* v. *Kemp*, 4 Mod., 187 ; *S. C.*, 2 Salkeld, 637 ; *Holford*
v. *Bailey*, 13 Q. Bench, 426 ; *Collins* v. *Benbury*, 5 Iredell
Law, 118 ; *Delaware & Maryland R. R. Co.* v. *Stump*, 8 Gill
& J., 479 ; *Phipps* v. *The State*, 22 Md., 380.

Whether we regard the plaintiff as the owner of the
water of North Pond, and so the sole owner of the right of
fishing therein, or as having acquired the exclusive right to
fish there by adverse use, we are clearly of the opinion that
as against him no member of the unorganized public has
the right to fish in that pond.    It follows from this that the
report of the committee finds the highway not to be of
common convenience and necessity.

There is error in the judgment of the Superior Court.

In this opinion the other judges concurred.