# Richmond

IMPROVED REALTY CORPORATION v. R. PINKNEY SOWERS, EXECUTOR OF R. L. SOWERS, DECEASED.

November 30, 1953.

Record No. 4109.

Present, All the Justices.

The opinion states the case.

*Stuart G. Christian* and *W. Moscoe Huntley*, for the appellant.

*William Eldridge Spain* and *William Old*, for the appellee.

BUCHANAN, J., delivered the opinion of the court.

This is a suit for the specific performance of a written contract for the sale of real estate. It was brought by R. L. Sowers, the vendor, herein called complainant, who thereafter died, and his executor, the present appellee, was substituted. It was brought against Improved Realty Corporation, the appellant, herein called defendant, which was owned by R. L. Brown and J. A. Schwalm. The court below heard the evidence *ore tenus* and for reasons stated in a written opinion held that the complainant was entitled to specific performance of the contract and granted judgment against the defendant for the contract price, to be paid on delivery of a proper deed. The defendant appealed.

In March, 1948, there appeared in a Richmond newspaper an advertisement headed "Sportsmen . . . here's the *grist* of the story . . . " and continuing thus: "Looking for a business-pleasure combination? This unique property consists of a *75-acre fish pond* plus 50 acres of good, dry land." A short description of the property followed, after which was this: "Think over the first part: A 75-ACRE FISH POND!"

The advertisement attracted the attention of Brown and Schwalm, who for some time had been looking around for a fishing pond to buy. The real estate agent in charge gave them directions for reaching the property and they went to examine it. R. L. Sowers, the owner, showed it to them and rowed them over the pond in his boat to its headwaters. They discussed with him the size of the pond, they testified, and he told them there were 75 acres in it, possibly 80 or 85; and that he owned to the high water mark around the pond, which included five feet.

Thereafter, on May 17, 1948, a written contract was executed by the parties by which the corporation agreed to pay $18,500 for the tract of land with improvements thereon, described as being in King and Queen county, on the road from Bruington to Shepherd's Church, containing 50 acres, more or less, with the grist mill property "and the rights, franchises and privileges of every kind and description ap-

pertaining to the said mill property and the pond to the same. * * Subject to any title defects that a survey may reveal." The terms of sale were to be complied with in 30 days, or as soon thereafter as the title could be examined, and a deed of general warranty for the property was to be delivered and the purchase money paid "provided the title thereto be good."

Afterwards, in June, 1948, a survey was made which disclosed that the pond contained only 20.4 acres. About that time the attorney employed to examine the title advised the defendant's counsel that in his opinion the people who owned the land adjacent to the pond had the right to use it to its center line, and "that the title to the bed of the pond was defective or the title to the property was defective." Defendant's counsel advised it not to pay the purchase price and accept a deed for the property. This suit was thereupon filed in January, 1949. After a demurrer was overruled the defendant filed its answer alleging that the description of the property was insufficient and that the complainant was not able to convey the property which the defendant agreed to purchase. At the time of hearing the evidence, January 7, 1952, defendant filed an amended answer alleging a material misrepresentation as to the area of the pond.

At a pretrial conference the trial court held, over the objection of the defendant, that the contract of May 17, 1948, did not purport to convey the pond, but only the rights, franchises and privileges appertaining thereto, and since it was not clear from the contract what these were, parol evidence could be admitted to show what the parties intended them to be. In its opinion the court held they meant "exclusive fishing rights and control of the waters of the pond for the grist mill purposes;" that the complainant had acquired and owned these rights by prescription and could perform his contract; and that the misrepresentation as to the area of the pond was was not material because the owners of the defendant corporation, who were business men of many years' experience, had themselves viewed the

premises and were not misled or damaged. The assignments of error challenge these rulings.

The first and controlling question is whether the complainant owned exclusive fishing rights in the pond. While there was evidence that the defendant thought that the pond itself was to be conveyed, that position is not argued in the brief, but the defendant's contention now is that the complainant failed to prove ownership of the exclusive fishing rights.

"The burden is on the vendor who asks for the specific execution of a contract to show that he has such title as he contracted to convey." *McAllister* v. *Harman*, 101 Va. 17, 25, 42 S. E. 920, 923.

Under the contract of May 17, 1948, the defendant was entitled to have a clear title, reasonably free from doubts or defects which might embarrass its full and quiet enjoyment of the premises, and it will not be compelled in equity to accept a doubtful or litigious title. 19 Mich. Jur., Vendor and Purchaser, § 10, p. 315; *Newberry* v. *French*, 98 Va. 479, 36 S. E. 519; *Sachs* v. *Owings*, 121 Va. 162, 92 S. E. 997; Annotation, 57 A. L. R. 1253, at p. 1288.

The complainant had no record title to the pond. He claimed to own the exclusive fishing rights by prescription, and to prove that right he introduced three witnesses. One was L. C. Watkins, the sheriff of King and Queen County, who owned the property from 1916 to 1929, when he conveyed it to complainant and his brother. During that time the mill was operated with water from the pond; Watkins leased the fishing rights to some Richmond people; no one disputed or encroached upon his right to rent the fishing rights; during the 13 years of his ownership he claimed and asserted the right exclusively to fish in the pond; he had boats on the pond, and nobody else did, except the Mitchells "used to water their horse in the pond and they had an old boat in there, but it rotted and they never put in any new one. This land juts up into their place—this pond." He

said he never at any time claimed to own the bed of the pond.

The other two witnesses were the appellee, R. Pinkney Sowers, nephew of R. L. Sowers and his sole devisee, and the former's brother, James R. Sowers. In substance they testified that from the time their father and R. L. Sowers purchased the property from Watkins, in 1929, some member of their family stayed on the place during the summer; the whole family went to the pond every week-end that the weather permitted, and some member of the family was there at least twice a month during the winter. (They lived in Chesterfield county). When the purchase was made, their father and uncle began to assert the exclusive right to fish in the pond and to control the pond; signs were posted on tree laps and posts in the pond reading "Private Pond No Fishing;" there had never been any dispute or contest of their exclusive right to use the pond; they never allowed anybody else to have a boat; no one was allowed to fish even from the banks; at times people would slip in and fish but would run away when they approached. In 1943 the interest of their father in the property was conveyed to R. L. Sowers, who then took complete control and lived on the property thereafter until his death in 1951, and during the last five years he rented fishing rights to people from Richmond and other places. R. Pinkney Sowers testified that nobody could say who owned the land under the pond.

In *Providence Fishing Club* v. *Miller Mfg. Co.*, 117 Va. 129, 83 S. E. 1047, this court held that an adjoining land owner on an inland fresh water lake or pond takes to the center, the same rules applying in such cases as apply in cases of streams.

The map of the survey and the evidence in the present case show that all around and bordering on the pond, which is 4,000 feet long, are tracts belonging to "sundry owners" and others who are named on the map and in the evidence, no one of whom is a party to this suit or testi-

fied herein except the appellee, owner of the tract in controversy which contains 48.3 acres and extends approximately 1800 feet along the north side of the pond and on around the east end for perhaps 600 feet. After this controversy arose, and in an effort to settle it, an attempt was made to secure quitclaim deeds from these other owners, but the second one approached, Mitchell, refused and the attempt was abandoned.

In 36 C. J. S., Fish, § 5 at p. 836, it is said:

"The right of fishing in non-navigable waters over or on the soil of a private proprietor may be acquired by an uninterrupted and exclusive occupation and enjoyment, adverse to the owner of the soil, and continued for twenty years, or for the period of time, whatever it may be, limited by the statute of limitations for the right of entry on land. There must, however, be an actual and exclusive occupation and enjoyment of the fishery, adverse to the riparian proprietor; the annual temporary use of a fishing privilege is not sufficient." See also *Turner* v. *Hebron*, 61 Conn. 175, 22 A. 951 (a case in which, however, the plaintiff was the owner of the water and of all the land surrounding it, and claiming against the public); *Bosworth* v. *Nelson*, 170 Ga. 279, 152 S. E. 575.

"To acquire a right by prescription the use and enjoyment of what is claimed must have been adverse, under a claim of right, exclusive, continuous, uninterrupted and with the knowledge and acquiescence of the owner of the estate in, over or out of which the easement prescribed for is claimed." 14 Mich. Jur., Prescription, § 7, p. 563.

" * * The occupancy necessary to create title by adverse possession must be hostile and exclusive. * * ." *Providence Fishing Club* v. *Miller Mfg. Co., supra*, 117 Va. at p. 133, 83 S. E. at p. 1049.

But a body of water owned by a number of different persons by virtue of ownership of the adjoining lands does not as readily lend itself to exclusive possession by one owner, hostile and adverse to the rights of the others, as does a

body of land which may be occupied and possessed in a way that is open and unmistakable. The rights of user are not the same. Boundary lines under the water are usually not fenced, as they were not in this case, are invisible to man and disregarded by fish which are on one man's property today and on another's tomorrow.

" * * In the case of inland lakes where the titles of the several riparian owners include the land covered by water, they may, as a general rule, together with their lessees and licensees, use the entire surface of the lake for boating and fishing, so far as they do not interfere with the reasonable use of the water by other riparian owners." 22 Am. Jur., Fish and Fisheries, § 21, p. 682. *Hardin* v. *Jordan*, 140 U. S. 371, 11 S. Ct. 808, 35 L. ed. 428 at p. 436; *Taylor Fishing Club* v. *Hammett* (Tex. Civ. App.) 88 S. W. (2d) 127, 130; Annotation, 5 A. L. R. 1056.

In *Davis* v. *Beury*, 134 Va. 322, 347, 114 S. E. 773, 780, the court said: "The authorities hold that title by adverse possession is, under certain circumstances, a marketable title." Citing Maupin on Marketable Title to Real Estate. In the second edition of that work, § 292, pp. 737 *ff.*, it is stated:

"A purchaser may be compelled to take a title resting upon a hostile, adverse and uninterrupted possession, under color of title which has continued for a length of time sufficient to bar the rights of any possible adverse claimant. * * If the facts upon which such a title rests be clear and undisputed, the title stands upon the same ground as any other title founded upon matters *in pais*. But if the facts alleged be disputed and doubtful, specific performance will be denied under the rule that relieves the purchaser wherever he may, in the future, be compelled to resort to parol testimony to remove doubts about the title. * *

"In titles founded on the Statute of Limitations there must be evidence to show, (1) that the possession has been open, hostile, adverse, notorious, and uninterrupted for the statutory period; (2) that there is no saving to any person on

account of personal disabilities; and (3) it must appear that in all human probability the purchaser will have the means at hand to establish his title by adverse possession if it should be attacked by a third person in the future. * * ."

The evidence of possession in this case does not establish such a title as equity ought to compel the defendant to accept. The possession, while intended to be adverse, was not shown to be actually so. It was not inconsistent with the friendly exercise of a legal right. It was not necessarily the assertion of a hostile and adverse claim. There was nothing to put the other owners on notice that the fishing and boating being done by the complainant were pursuant to a claim of right, for the purpose of acquiring title to the exclusive fishing and boating privileges, and not to be mistaken for the exercise of the right held in common by the complainant and his neighboring proprietors. Even the "No Fishing" signs that were posted could have been taken by the other owners as notice to the general public, not to them. The evidence does not show that the neighboring owners knew or were charged with knowledge that they would have to take action to avoid losing their titles. None of them is a party to this suit and none testified as a witness. They are not bound by the finding of the trial court that the titles once owned by them have now been acquired by the complainant; and if they undertook to assert them against this defendant, it cannot be known with reasonable certainty from this record whether they would succeed.

Our conclusion on this phase of the case makes it unnecessary to deal with defendant's other assignment of error to the ruling that the representation that the pond contained 75 acres was not material because defendant's owners viewed it before the contract was signed. That point is not wholly free from question, however, in view of the fact that the pond was long, narrow and winding; and the real estate agent, witness for the complainant, who had himself been on the bond with the complainant three times, testified that when the complainant told him, in listing the property for

sale, that the pond contained 75 acres, he had no reason to doubt it.

The specific performance of a contract is not a matter of absolute right, but rests in a sound judicial discretion and should not be decreed when it would be inequitable to do so under the facts of the particular case. 17 Mich. Jur., Specific Performance, § 4, p. 8.

Here the defendant wanted for its private use a fishing pond and thought it was buying one containing 75 acres. What the complainant offers in that respect to convey, and all he can convey, is the right to fish in a pond of 20.4 acres, which the complainant claims is an exclusive right, to which, however, he has no record title but claims it by virtue of adverse possession and user, depending upon oral evidence which in itself is not conclusive.

The complainant failed to establish his right to have specific performance of the contract of May 17, 1948. The decree appealed from is, therefore, reversed and a final decree will be entered here.

*Reversed and final decree.*