[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1245 
 On Application for Rehearing
The opinion of December 19, 1997, is withdrawn and the following is substituted therefor.
This case centers around a water-rights dispute involving a reconstructed man-made lake located near Chelsea, Alabama. The plaintiffs, Norman A. Wehby and Nancy H. Wehby, own property in a residential area (hereinafter "Chelsea Place"); that property includes a portion of the bed and shoreline of the lake. Two streams flow into the lake, including Yellowleaf Creek, which the Wehbys allege is capable of being traversed by boats and canoes during some parts of the year. In August 1979, Clarence W. Hatcher and his wife sold a portion of their Chelsea Place property to the Huffman Assembly of God ("the Church"), including most of the land on which the lake now lies. When the Church purchased the property, the lake bed was dry. The Church repaired the dam and reconstructed the lake. The Hatchers gave the Church permission to install a part of the dam and spillway on their property. The water level of the lake later rose, causing part of the Hatchers' property to flood. In exchange for the use of their property, the Church granted the Hatchers a license to use the lake for recreational purposes. It is undisputed that the Hatchers had a license to use the lake for recreational purposes and that every family owning land surrounding the lake also used the lake for such purposes. However, no documents exist indicating that the Church granted the Hatchers an easement over the lake.
In 1985, the Wehbys purchased from the Hatchers the partially flooded property next to the lake. The property description in the warranty deed did not refer to the lake, and the deed did not mention any water rights. The title insurance policy the Wehbys obtained describes an easement granted to the Church for a road. However, the policy mentions no easement or conveyance regarding the lake, and it specifically states that "Riparian Rights are neither guaranteed nor insured." The Wehbys claim that when they purchased the property they relied on statements made by Mr. Hatcher. Apparently, Mr. Hatcher claimed that the right to use the lake ran with the property. With the exception of the Wehbys' testimony, no evidence exists to support their claim.
In June 1991, SouthTrust Bank acquired, through foreclosure, the property of the Cathedral of the Cross (formerly the Huffman Assembly of God); that property included the Chelsea Place property, including the lake. Before the foreclosure, United States Bankruptcy Judge Clifford Fulford had ruled that Hatcher had "no right, title, interest in or lien upon the Chelsea Place property or any lakes, ponds or streams contained thereon." To facilitate the sale, Judge Fulford apparently ordered Hatcher to execute a quitclaim deed conveying to SouthTrust Bank all interest that he claimed to have in the Chelsea Place property.
In February 1992, SouthTrust Bank sold and deeded its Chelsea Place property, including the lake, to Landscape Services. Landscape Services later transferred a portion of that lakefront property to Tommy E. Turpin and Marla Turpin. Michael T. Atchison, a real estate attorney practicing in Shelby County, said that before 1993 he discussed with the Wehbys their right to use the lake. Atchison also stated that he had *Page 1246 
informed the Wehbys before 1993 that they had no rights in that part of the lake that extends past the surface waters covering their property. In addition, Atchison said that he informed the Wehbys that use of the lake or lake bed past their property boundary would be either adverse to the true owners or by permission of those owners. Mr. Wehby claims, however, that he never met, or discussed anything with, Atchison before 1993.
The Wehbys claim that in April or May 1995, they contracted to sell their property to Dale New and Kate New for $130,000. Presumably, the News and the Wehbys signed a contract in each other's presence. Mr. Wehby claims that a couple of days later he went to Atchison's office to sign some papers regarding the sale. Atchison denies ever having prepared, having seen, or having been in possession of the alleged contract, and neither the Wehbys nor the News could produce a copy of it. Because of the confusion over the lake rights, however, the News expressed doubts as to whether they would buy the Wehbys' Chelsea Place property. Mr. New and Mr. Wehby confronted Landscape Services' vice-president, O.G. Touchstone, regarding the lake rights. Touchstone denied that the Wehbys had any right to use the lake; he said, however, that he would allow the News to use the lake should they purchase the Wehbys' property. As a result, according to the Wehbys, the News declined to purchase the property and the Wehbys had to forfeit earnest money that had been paid on the contract.
The Wehbys sued the Turpins, Touchstone, and Landscape Services. Arguing that they have riparian or littoral rights in the lake, the Wehbys sought a judgment declaring that they have the right to use the entire lake for recreational purposes; alternatively, they claimed that the lake is "public," within the meaning of Ala. Code 1975, § 9-11-80(a), or that they have an easement, either express or implied, to use the lake. The Wehbys also claimed that the defendants had intentionally interfered with a contract for the sale of their Chelsea Place property. In addition, the Wehbys sought a declaration that they had the right to remove that portion of the dam and spillway located on their property. The defendants, on the other hand, contended that the lake is private; that the Wehbys possess no ownership interest in the majority of the lake; that the Wehbys have no littoral or riparian rights in the area of the lake not owned by them; and that the Wehbys have neither an express easement, nor an implied easement, to use the lake for any purpose. The trial court entered a summary judgment for all of the defendants.[1]
A summary judgment is proper and must be affirmed on appeal when no genuine issues of material fact exist and the moving party is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P.; Hughes v. Hertz Corp., 670 So.2d 882 (Ala. 1995). Once the moving party makes a prima facie showing that he is entitled to a judgment as a matter of law, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. Id. We review the record in the light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Hurst v. Alabama PowerCo., 675 So.2d 397 (Ala. 1996).
The threshold issue in this case concerns who has control over the surface waters of a private, nonnavigable lake, when the lake bed is owned by two or more adjoining landowners. Primarily, the Wehbys argue that because their land is partially flooded and is contiguous to the lake, they have littoral or riparian rights[2] in the entire surface waters above the lake bed. This issue is one of first impression in Alabama. Therefore, we must examine the law of other jurisdictions *Page 1247 
to gain a better understanding of the origins and evolution of littoral or riparian rights.
Most jurisdictions appear to adhere to the so-called common law rule. Under this rule, the owners of the fee in land underlying the surface waters of a man-made, nonnavigable lake are entitled to the exclusive control of that portion of the lake lying over the land as to which they own the fee. Ours v.Grace Property, Inc., 186 W. Va. 296, 300, 412 S.E.2d 490, 494
(1991). "Consequently, the owner of a portion of a lake bed has the right to exclude others, including any other owners of the lake bed, from using his property." Grace Property, supra,186 W. Va. at 299, 412 S.E.2d at 493; see Anderson v. Bell,433 So.2d 1202 (Fla. 1983) (distinguishing that case from the court's earlier decision in Duval v. Thomas, 114 So.2d 791
(Fla. 1959), discussed infra, in which the Florida Supreme Court had adopted the civil law rule); Black v. Williams,417 So.2d 911 (Miss. 1982) (addressing only the rights of owners of land beneath "artificial" or "man-made" lakes); Crenshaw v.Graybeal, 597 So.2d 650 (Miss. 1992); Medlock v. Galbreath,208 Ark. 681, 187 S.W.2d 545 (1945); Lanier v. Ocean Pond FishingClub, Inc., 253 Ga. 549, 322 S.E.2d 494 (1984); Sanders v. DeRose, 207 Ind. 90, 191 N.E. 331 (1934); Baker v. NormanochAss'n, Inc., 25 N.J. 407, 136 A.2d 645 (1957); CommonwealthWater Co. v. Brunner, 175 A.D. 153, 161 N.Y.S. 794 (1916);Smoulter v. Boyd, 209 Pa. 146, 58 A. 144 (1904); Taylor FishingClub v. Hammett, 88 S.W.2d 127 (Tex.Civ.App. 1935); Wickouski v.Swift, 203 Va. 467, 124 S.E.2d 892 (1962).
An application of the majority rule can be found inAnderson v. Bell, supra, which was factually similar to the present case. In that case, the plaintiff, Anderson, purchased a tract of land traversed by a nonnavigable creek. Anderson later excavated and constructed an earthen dam; the construction created a substantial lake. As a result of the lake formation, several surrounding parcels were flooded, including land owned by Lewis and Watson. A dispute arose over the flooding. As part of a settlement agreement, Lewis and Watson conveyed a flowage easement to Anderson, expressly reserving title and beneficial use of their land. Lewis and Watson later sold their land to the defendant, Bell. Anderson subsequently sued to enjoin Bell from using the surface waters owned by Anderson, but not the waters covering Bell's property. The Florida Supreme Court, applying the common law rule, distinguished Anderson from its earlier decision in Duval,supra. In Duval, the court had adopted the civil law rule, allowing each landowner owning portions of the lake bed the reasonable use and enjoyment of the entire surface waters of the lake. The Anderson court noted, however, that Duval was expressly limited to natural watercourses. Therefore, theAnderson court held "that the owner of property that lies adjacent to or beneath a man-made, non-navigable water body is not entitled to the beneficial use of the surface waters of the entire water body by sole virtue of the fact that he/she owns contiguous lands." Anderson, 433 So.2d at 1204. Furthermore, the Anderson court noted that nothing had prevented the defendant's predecessors in title (Lewis and Watson) from bargaining for an easement to use the water in exchange for the flowage right granted to Anderson. Likewise, in the present case, the Church could have granted an easement to the Hatchers for the use of the lake in exchange for the rights the Hatchers granted to the Church, i.e., the rights to flood and to build part of the spillway and dam on their property. No legal documents exist that would indicate that the Wehbys or their predecessors in interest, the Hatchers, had any claim to the water rights regarding the lake. The only evidence the Wehbys produced regarding water rights as to the lake was the oral assurances of Mr. Hatcher that lake rights ran with the property.
The Mississippi Supreme Court, in Black v. Williams, 417 So.2d at 912, also following the common law rule, held that owners of land beneath artificial or man-made lakes have exclusive control over their respective portions of the water.Ours v. Grace Property, Inc., supra, involved a private man-made lake owned entirely by the parties to the action; the appellees owned 98% of the lake bed, while the appellant, a corporation with approximately 400 shareholders, owned 2% of the lake bed. The Supreme Court of *Page 1248 
West Virginia, applying the common law rule, held for the appellees, stating that "where ownership of the land underlying a man-made lake is clear and distinct, the owner of a portion of the lake bed has the exclusive control and use of the water above the portion of the lake bed which he owns."186 W. Va. at 300, 412 S.E.2d at 494. Similarly, in Wickouski v. Swift,supra, the body of water at issue was a nonnavigable pond created by a dam. The Swifts owned approximately 28 acres of the land underneath the pond and the Wickouskis owned approximately 1.3 acres of land covered by the pond. The surface boundaries and the boundaries underneath the pond were undisputed. The court noted that control over the surface waters derives from ownership of the land. The ownership of land underlying surface waters also covering the land of others, the court reasoned, does not convey a "right to trespass." 203 Va. at 470, 124 S.E.2d at 895. Therefore, following the common law rule, the court held that the Swifts had exclusive control of the waters covering their property.203 Va. at 471, 124 S.E.2d at 895.
Other jurisdictions have adopted the so-called civil law rule. Under this doctrine, an owner of land abutting or extending into portions of a lake, whether navigable or not,[3] is, purely by virtue of riparian rights, entitled to the reasonable use and enjoyment of the entire lake. See GraceProperty, supra; Beacham v. Lake Zurich Property Owners Ass'n,123 Ill.2d 227, 231, 526 N.E.2d 154, 122 Ill.Dec. 14 (1988);Duval v. Thomas, supra; Beach v. Hayner, 207 Mich. 93,173 N.W. 487 (1919); Greisinger v. Klinhardt, 321 Mo. 186, 9 S.W.2d 978
(1928); Improved Realty Corp. v. Sowers, 195 Va. 317,78 S.E.2d 588 (1953); Johnson v. Seifert, 257 Minn. 159,100 N.W.2d 689 (1960); Snively v. Jaber, 48 Wn.2d 815,296 P.2d 1015 (1956); C.C. Marvel, Annotation, Rights of Fishing,Boating, Bathing or the Like in Inland Lakes, 57 A.L.R.2d 599 (1958).
An application of the minority rule can be found inJohnson v. Seifert, supra, where the Minnesota Supreme Court, applying the civil law rule, rejected the logic of a rule (the common law rule) that would restrict riparian rights simply because an abutting landowner also owns part of the soil beneath the water. 257 Minn. at 166-67, 100 N.W.2d at 695. TheSeifert court stated that the navigability of waters has no bearing on riparian rights because, it said, those rights arise as an incident to the ownership of abutting land, and it stated that ownership in the lake bed carries no right to control the surface waters of the lake. 257 Minn. at 165,100 N.W.2d at 694. Thus, the Seifert court held:
 "[A]n abutting or riparian owner of a lake, suitable for fishing, boating, hunting, swimming, and other uses, domestic or recreational, . . . has a right to make such use of the lake over its entire surface, in common with all other abutting owners, provided such use is reasonable, . . . regardless of the navigable or public character of the lake and regardless of the ownership of the bed thereof."
257 Minn. at 168-69, 100 N.W.2d at 696-97. States applying the civil law rule apparently give weight to the notion that the common law rule would operate only to frustrate the *Page 1249 
beneficial use and enjoyment of an important recreational resource. See Beacham, 123 Ill.2d at 231, 526 N.E.2d at 156-57, 122 Ill.Dec. at 17; Duval, 114 So.2d at 795.
Section 1-3-1, Ala. Code 1975, states that "[t]he common law of England, so far as it is not inconsistent with the Constitution, laws and institutions of this state, shall . . . be the rule of decisions, and shall continue in force, except as from time to time it may be altered or repealed by the legislature." The Wehbys, who urge us to adopt the civil law rule, assert, however, that the term "common law rule" may be somewhat of a misnomer as it applies to rights of riparian owners in this case. The Wehbys cite cases that suggest the English common law relating to water rights had its origins in the Roman civil law. See Hardin v. Jordan, 140 U.S. 371,390-91, 11 S.Ct. at 814-15, 35 L.Ed. 428 (1891) (quotingMacKenzie v. Bankes, (1878) L.R. 3 App.Cas. (Eng.) 1324, 1338);Hughes v. Anderson, 68 Ala. 280 (1880). However, Lord Blackburn, in Bristow v. Cromican, L.R. 3 App.Cas. 641, stated:
 "The first question that I shall discuss is whether it is conclusively shown that Charles II. had, in 1660 and 1661, title to property he purported to . . . convey. I think he had not. The property in the soil of the sea and of estuaries, and of rivers in which the tide ebbs and flows, is, prima facie, of common right, vested in the crown; but the property of dry land is not of common right in the crown. It is clearly and uniformly laid down in our books that, where the soil is covered by the water forming a river in which the tide does not flow, the soil does of common right belong to the owners of the adjoining land; and there is no case or book of authority to show that the crown is of common right entitled to land covered by water, where the water is not running water forming a river, but still water forming a lake."
(Quoted in Hardin v. Jordan, 140 U.S. at 392, 11 S.Ct. at 815.) The Court in Hardin v. Jordan, supra, quoted, at length, Mr. Justice Depue's discussion of common law principles in New Jersey. He stated:
 "In this state, . . . there is nothing in topography or location that requires a departure from the rules of the common law. Unlike some of our sister states, we have no large inland lakes [on] which an extensive commerce is carried on, or which are the boundaries with a foreign nation. . . . Our system of land titles, and the decisions of our courts, have been in conformity with the common law on this subject, and whatever departure has been therefrom has not been to enlarge the public domain at the expense of private ownership. . . . By common law, all waters are divided into public waters and private waters. In the former, the proprietorship is in the sovereign; in the latter, in the individual proprietor. The title of the sovereign[,] being in trust for the benefit of the public, which includes the right of fishing and of navigation, is common. The title of the individual, being personal in him, is exclusive, subject only to a servitude to the public for purposes of navigation, if the waters are navigable in fact."
(Quoted in Hardin v. Jordan, 140 U.S. at 395, 11 S.Ct. at 816.)
We are bound to follow the majority common law rule, set out in the cases discussed above, as the rule of law governing decisions in this state. See also Hollis v. Crittenden,251 Ala. 320, 37 So.2d 193 (1948) (noting that Alabama is a common law state). Under the statutory provision that, "so far as it is not inconsistent with the Constitution, laws and institutions of this state," the common law governs in this state, we apply the common law rule and hold that the owners of land extending beneath artificial or man-made lakes, not navigable as a matter of law, have surface-water rights only in the surface waters above their land. We conclude that the Wehbys, in the absence of some covenant, agreement, or statute to the contrary, have no right to use that portion of the lake beyond the boundaries of their own land. See Black v. Williams, 417 So.2d at 912.
The Wehbys also contend that Yellowleaf Creek is navigable at the point where the dam is located. They rely on Ala. Code 1975, § 9-11-80, for the proposition that Yellowleaf Creek, being a natural waterway flowing through lands belonging to more than one person, is a public waterway. The *Page 1250 
Wehbys assert that the lake is public and, therefore, that the common law rule would have no field of operation because the lake's source is capable of being traversed by fishing boats and canoes during some parts of the year. The Wehbys do acknowledge, however, that impounded waters are not within the definition of "public waters" in § 9-11-80 and, therefore, that the lake is not a public lake, within the meaning of the statute, unless Yellowleaf Creek was navigable where the dam was placed.
The Federal Government has paramount authority respecting navigation; therefore, the test of navigability is a federal question. Utah v. United States, 403 U.S. 9, 11, 91 S.Ct. 1775,1776, 29 L.Ed.2d 279 (1971); The Daniel Ball, 10 Wall. 557,77 U.S. 557, 563, 19 L.Ed. 999 (1870). Addressing the test for determining the navigability of waters, the Supreme Court stated in The Daniel Ball:
 "Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."
77 U.S. at 563. The test for navigability applies to all watercourses. Utah v. United States, 403 U.S. at 11-12,91 S.Ct. at 1776-77; United States v. Oregon, 295 U.S. 1, 14,55 S.Ct. 610, 615, 79 L.Ed. 1267 (1935). The fact that a waterway is on occasion susceptible to navigability during brief periods of flood or high water does not mean that the waterway is navigable in fact. United States v. Harrell, 926 F.2d 1036,1040 (11th Cir. 1991). We conclude that the Wehbys did not produce substantial evidence indicating that Yellowleaf Creek satisfies the federal test of navigability.
A stream is navigable in law if it has an aptitude for beneficial public servitude, capable of being traversed for valuable floatage for a considerable part of the year.Rhodes v. Otis, 33 Ala. 578, 597-98 (1859). Proof of occasional use by "fishing boats" and "canoes" during some parts of the year is not sufficient to demonstrate that Yellowleaf Creek is capable of any beneficial public use. Therefore, we hold that Yellowleaf Creek and, necessarily, Chelsea Place Lake, are, as a matter of law, not navigable waterways. As the United States Court of Appeals for the Eleventh Circuit held in United Statesv. Harrell, supra, § 9-11-80(a) applies only to navigable waters. That court correctly stated that " 'the State does not own the "bed and bottom" of non-navigable streams.' " 926 F.2d at 1043 (quoting Hood v. Murphy, 231 Ala. 408, 165 So. 219
(1936)). Chelsea Place Lake, being "nonnavigable" and "held in fee" by private owners, is "private" within the meaning of §9-11-80(b).
The Wehbys further contend that they possess an easement, either express or implied, to use the entire lake for recreational purposes. Alabama recognizes that an easement may be created by implication. Cleek v. Povia, 515 So.2d 1246
(Ala. 1987).
 " '[An easement by implication] requires not only original unity of ownership, but also that the use be open, visible, continuous, and reasonably necessary to the estate granted. . . . The implication is that the parties [intended for such an easement to exist] because the grantee, having seen the use the grantor made of the property, can reasonably expect a continuance of [the former manner of] use.' "
Polhemus v. Cobb, 653 So.2d 964, 966-67 (Ala. 1995) (quotingHelms v. Tullis, 398 So.2d 253, 255-56 (Ala. 1981)).
The Wehbys purchased the lakefront property from the Hatchers. Before that, the Hatchers had sold another portion of their property to the Church, including most of that land where the lake now lies. When the Hatchers sold that property to the Church, they reserved no easement for the use of the lake. Of course, no lake existed when the Hatchers sold the property to the Church; it was not until later that the Church built the dam. Nevertheless, when the Hatchers agreed to allow a portion of the lake to flood their property, and to allow part of the spillway and dam to be built on their property, they did not obtain an easement for the use of the entire lake. Instead, the Church *Page 1251 
merely granted the Hatchers permission to use the lake for recreational purposes.
A license denotes the "giving of one's consent" to do or perform a specified activity; a license is a personal privilege and is generally revocable at the will of the licensor. SeeCamp v. Milam, 291 Ala. 12, 17, 277 So.2d 95, 99 (1973) (a license is generally revocable by the licensor; however, significant expenditures by the licensee can create an equitable right in the property). Furthermore, a license "is by its very nature personal; and, being a personal right, it is not an interest which attaches to or runs with the land, nor can it be assigned, conveyed or inherited. Neither can [it] . . . ripen into an easement by prescription, however long continued." Camp, 291 Ala. at 19, 277 So.2d at 100; Shearer v.Hodnette, 674 So.2d 548, 551 (Ala.Civ.App. 1995). Thus, the Wehbys' predecessors in interest, the Hatchers, held no legal interest in the lake (beyond the boundaries of their portion of the lake bed) and no authority to transfer any personal right in the lake beyond the boundaries of their portion of the lake bed. The Hatchers' use beyond their portion was permissive only; and because the Wehbys did not acquire their property from the owner of that portion of the lake extending beyond the boundaries of their property, there was no original unity of ownership. Therefore, as a matter of law, there was no easement, either express or implied, in favor of the Wehbys.
The Wehbys' final contention is that the defendants intentionally interfered with their contract to sell the Chelsea Place property to the News. The elements of the tort of intentional interference with a contract or business relation are (1) the existence of a contract; (2) knowledge of that contract on the part of the defendant; (3) intentional interference with that contract by the defendant; and (4) damage resulting from the interference. Lowder Realty, Inc. v.Odom, 495 So.2d 23 (Ala. 1986). Of course, justification for any interference with a contract may be raised by the defendant as an affirmative defense. Id. The defendants made a prima facie showing that there was no genuine issue of material fact as to whether they had intentionally interfered with a contract. The Wehbys did not rebut that prima facie showing; they presented no evidence indicating that the defendants had intentionally interfered with any contract. We note that when the Wehbys confronted Touchstone concerning the lakerights dispute, he merely stated that he believed the Wehbys did not have the right to use the lake. Of course, based on our holding today, the defendants were, as a matter of law, justified in expressing their opinion that the Wehbys had no rights in the lake beyond their portion of the lake bed. The claim alleging intentional interference with a contract is, therefore, without merit. See Hurst v. Alabama Power Co., 675 So.2d at 399; LowderRealty, Inc. v. Odom, 495 So.2d at 25.
We conclude that the defendants met their burden of showing that no genuine issue of material fact existed as to any of the Wehbys' claims and that the Wehbys presented no substantial evidence to rebut that showing. The judgment is, therefore, affirmed.
OPINION OF DECEMBER 19, 1997, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED; APPLICATION FOR REHEARING OVERRULED.
HOOPER, C.J., and MADDOX, ALMON, SHORES, COOK, and SEE, JJ., concur.
BUTTS, J., concurs in the result.
KENNEDY, J., dissents.
[1] The judgment did not adjudicate the Wehbys' claim that they had the right to remove the dam and spillway from their property. However, the judgment was certified as final pursuant to Rule 54(b), Ala.R.Civ.P.
[2] The term "riparian rights" refers to the rights of owners of land abutting a stream, while the term "littoral rights" refers to the rights of owners of land abutting the surface waters of a lake or the sea. See Mobile Dry Docks v. City of Mobile,146 Ala. 198, 40 So. 205 (1906); 78 Am.Jur.2d Waters § 260 (1975 
Supp. 1991). Courts now commonly use the word "riparian" when describing water rights in either context. See Am.Jur.2dWaters, supra at § 260.
[3] Courts adopting the civil law rule have held that the navigability of waterways has no effect on the rights of riparian owners. For example, the court in Johnson v. Seifert,257 Minn. 159, 165, 100 N.W.2d 689, 694 (1960), stated:
 "Any assumption that a lake — whether it be meandered or not — whose shore is owned by more than one tract owner does not involve riparian rights unless it is navigable under the Federal test of navigability is wholly untenable and must be rejected. It is not to be overlooked that the Federal test of navigability is designed for the narrow purpose of determining the ownership of lake beds, and for the additional purpose of identifying waters over which the Federal government has paramount authority in the regulation of navigation. Whether waters are navigable has no material bearing on riparian rights since such rights do not arise from the ownership of the lake bed but as an incident of the ownership of the shore."
(Citations omitted.) See 78 Am.Jur.2d Waters § 262 (1975 
Supp. 1991). Other courts have also stated that "[r]iparian rights are not confined to navigable waters." Greisinger v.Klinhardt, 321 Mo. 186, 193, 9 S.W.2d 978, 980 (1928) (citing 1 Farnham, Waters and Water Rights, 278). The Greisinger court further stated that riparian rights may attach equally to natural watercourses or to artificial watercourses designed or intended to be permanent. 321 Mo. at 193-94, 9 S.W.2d at 981
(citations omitted).