926 F.2d 1036
 The UNITED STATES of America and The United States Corps of Engineers, Walter M. Gollatte, Lewis Perry
Howard, Tony Howard, Andy Parnell, and Kirk Samples,
Plaintiffs-Appellants,
v.
C.E. HARRELL, Jr., Sidney M. Harrell, Defendants-Appellees.
 No. 89-7432.
 United States Court of Appeals,
Eleventh Circuit.
 March 15, 1991.
 
 Eugene A. Seidel, Asst. U.S. Atty., Mobile, Ala., for plaintiffs-appellants.
 Thomas R. Boller, Mobile, Ala., for Gollatte, et al.
 John A. Bryson, U.S. Dept. of Justice, Lands Div., Appellate Section, Washington, D.C., for the U.S.
 Halron W. Turner, Edward Turner, Chatom, Ala., and Louis E. Braswell, Mobile, Ala., for defendants-appellees.
 J.P. Courtney, III, Lyons, Pipes & Cook, P.C., Marion A. Quina, Jr. and Neil C. Johnston, Mobile, Ala., for amicus, Alabama Wildlife, etc.
 Appeal from the United States District Court for the Southern District of Alabama.
 Before HATCHETT and CLARK, Circuit Judges, and MORGAN, Senior Circuit Judge.
 CLARK, Circuit Judge:
 
 
 1
 Appellants challenge the district court's determination that Lewis Creek is not a navigable waterway of the United States. Because we agree with the district court that Lewis Creek is not navigable in fact and is not subject to the navigational servitude of the Tombigbee River, we affirm. In so concluding, we concur in the reasoning applied by the district court in reaching its decision.I. Facts
 
 
 2
 The Tombigbee River is a major artery of commerce, determined to be navigable by the United States Corps of Engineers for more than one hundred years. Lewis Creek, the subject of this action, is a tributary of the Tombigbee River located in southern Alabama about forty miles north of Mobile. The creek rises to the west of the Tombigbee, and as it winds eastwardly toward the river, it enters the defendants Harrells' property just west of the Southern Railroad trestle. Further downstream, Lewis Creek enters Harrell's Landing, a small pool of water, branches out into a number of unidentifiable fingers, meanders through a swamp, and empties into Three Rivers Lake, which flows about a mile before joining the Tombigbee. The stretch of Lewis Creek at issue here runs from the railroad trestle to the point at which the creek empties into Three Rivers Lake.
 
 
 3
 Eastern Washington County, in which the defendants' property is located, abuts the Tombigbee River and consists primarily of hardwood riverbottom lands. During the wet season, lasting generally from the latter part of December until late March, the Tombigbee River periodically overflows it banks and floods the bottomland. The hardwood forests in this bottomland contain commercially valuable stands of tupelo gum, cypress, wild pecan, willow, hickory and various types of oak. All of these species of trees are terrestrial, rather than aquatic; however, they will grow on land subject to intermittent flooding. With the exception of some cypress and tupelo stands, however, they will not grow in soil that is permanently or heavily flooded. During the dry seasons, the Harrells also have used the bottomlands for hunting dear and turkey, for growing and harvesting timber, and in previous years, for grazing cattle and hogs.
 
 
 4
 Private plaintiffs in this action are individuals who have commercially fished in Lewis Creek at times of high water, gaining access either by boating up the creek from the Tombigbee or with the permission of riparian owners. The defendants are riparian owners on both sides of Lewis Creek who claim the stretch of creek that runs through their property is private and who have sought to exclude plaintiffs from using this stretch of Lewis Creek for fishing.
 
 
 5
 On October 8, 1982, the Circuit Court of Washington County, Alabama determined and entered judgment that Lewis Creek was a non-navigable stream. The court enjoined appellants Walter W. Gollatte and Lewis Perry Howard from the use of Lewis Creek.
 
 
 6
 Subsequently, the United States and the United States Army Corps of Engineers, realigned plaintiffs, were consulted by the plaintiffs and, after inspection of the area, advised plaintiffs in a letter dated July 30, 1984 that because this stretch of Lewis Creek was "below the ordinary high water mark of the Tombigbee River," this reach of Lewis Creek "is a navigable water of the United States up to the Southern Railroad bridge at Toinette, Washington County." The private plaintiffs brought this action in the district court for the Southern District of Alabama, again seeking a declaration that Lewis Creek is a navigable waterway to which they have a right of public access.
 
 II. Discussion
 
 7
 In determining whether Lewis Creek is a navigable waterway of the United States within the meaning of section 10 of the Rivers and Harbors Act, 33 U.S.C. Sec. 403,[1] and whether appellants have a resulting right of access, we consider, first, whether Lewis Creek is navigable in fact; second, whether Lewis Creek, as a result of the Tombigbee floodwaters, is subject to the navigational servitude of the United States; and, finally, whether appellants have a right of public access to Lewis Creek under Alabama law. We review the district court's findings of fact under a clearly erroneous standard of review; its application of law to those facts is subject to de novo review.[2]
 
 
 8
 A. Navigability in Fact.
 
 
 9
 The district court, in making findings of fact, determined that Lewis Creek, as it flows through the defendants' land, is a "small, narrow, shallow, obstructed, partially dry creek that is incapable of any type of waterborne commerce." The creek, the court found, only becomes capable of use for such commerce "when the flood waters of the Tombigbee River break out of their banks on the main course of the river and back up across the intervening lands of others into the non-navigable bed of Lewis Creek."[3] The parties agree that absent the effect of the Tombigbee floodwaters on Lewis Creek, the creek itself is not a navigable waterway of the United States.
 
 
 10
 In United States v. Appalachian Electric Power Company, the Supreme Court held that a river is "navigable in fact" when it is used or susceptible of being used in its ordinary condition to transport commerce.[4] The court further held that "[w]hen once found to be navigable, a waterway remains so."[5] Navigable in fact, as the Court had previously held, means navigable in law.[6] The Corps of Engineers' regulations promulgated pursuant to the Rivers and Harbors Act incorporate the Appalachian Electric definition, defining navigable waters of the United States as "those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce."[7]
 
 
 11
 The district court, in concluding that Lewis Creek was not now and had not previously been navigable in fact, found that the original course of Lewis Creek as it exited the Harrells' Landing pool to the North was never used and was never susceptible for use in transporting commerce. The court also considered the effect of a dam which at one time had been constructed to divert the waters that flowed down the original course of the creek into a man-made ditch. The ditch had been channeled by the Cochran Lumber Company with the intention of creating a water flow capable of carrying timber from its mill. The court found that this ditch, sometimes referred to as Lewis Creek, proved to be as unsuccessful as the original creek itself for transporting logs and, thus, was not capable then or now of supporting commerce. The ditch, the court noted, is no more than several feet wide, is dammed up by beavers in numerous places, and has fallen trees and logs throughout its course.
 
 
 12
 It is clear that a stream, to be navigable, need not be open to navigation "at all seasons of the year, or at all stages of the water."[8] However, as the district court correctly reasoned, "susceptibility of use as a highway for commerce should not be confined to 'exceptional conditions or short periods of temporary high water.' "[9]
 
 
 13
 Because we hold that the district court's findings of fact are not clearly erroneous, we conclude that Lewis Creek is not, and never has been, navigable in fact. Lewis Creek currently is impassable under ordinary conditions prevailing throughout the year. Only when unpredictable, infrequent, and temporary flooding of the Tombigbee River occurs during parts of the winter months does Lewis Creek become passable; in some years, these floods do not occur at all. As to past usage, we hold that the district court correctly determined that Lewis Creek had not been used as an avenue of commerce. The court thoroughly reviewed evidence of prior usage, including use by the Cochran Lumber Company of the manmade ditch channeled to float timber down the creek.[10] As the court noted, this attempt to make Lewis Creek navigable also
 
 
 14
 proved unsuccessful and ultimately was abandoned because even with the construction by Cochran Lumber Company of a lock or dam ... there never was an adequate enough supply of water to float the lumber down the Creek, except in times of unusually high water, which did not occur with sufficient regularity to justify using the Creek as a means to transport timber in any form.[11]
 
 
 15
 Moreover, as the Supreme Court has held, "[t]he mere fact that logs, poles, and rafts are floated down a stream occasionally and in times of high water does not make it a navigable river."[12] Therefore, we hold that Lewis Creek is not navigable in fact.
 
 
 16
 B. Navigational Servitude.
 
 
 17
 As noted previously, the parties agree that absent the effect of the Tombigbee floodwaters on Lewis Creek, the creek itself is not a navigable waterway of the United States. Moreover, as we held above, even considering the effect of the Tombigbee floodwaters on Lewis Creek, the creek is not navigable in fact and, therefore, not navigable in law. However, a separate question, considered below, is whether the navigational servitude of the Tombigbee River, as a navigable waterway of the United States, extends to Lewis Creek, thereby creating a possible right of public access to the creek.
 
 
 18
 The question of navigability, as the district court correctly noted, is a federal question and has been defined by decisions of the federal courts.[13] Accordingly, section 329.3 of the Corps of Engineers' regulations states that the precise definitions of "navigable waters of the United States" are dependent on judicial interpretation.[14]
 
 
 19
 The Supreme Court, in United States v. Rands, held that "[t]he navigational servitude of the United States does not extend beyond the high-water mark."[15] According to the Army Corps of Engineers' regulations, federal regulatory jurisdiction over rivers and lakes, i.e., the navigational servitude of the United States, extends
 
 
 20
 laterally to the entire water surface and bed of a navigable waterbody, which includes all the land and waters below the ordinary high water mark. Jurisdiction thus extends to the edge (as determined above) of all such waterbodies, even though portions of the waterbody may be extremely shallow, or obstructed by shoals, vegetation or other barriers.[16]
 
 
 21
 It also is clear that the government's navigational servitude cannot extend over the bed of an inland body of water.[17] Nor does a river's ordinary high water mark encompass the river's peak flow or flood stages.[18] In fact, this restriction was explicitly stated in a prior version of the regulations,[19] but has since been omitted. As discussed below, we explicitly reject any attempt by appellants to extend the government's navigational servitude beyond the Tombigbee's navigable river "bed," as that term has been defined by the federal courts.
 
 
 22
 The navigable waters of the United States are public property. As one court of appeals recently noted,
 
 
 23
 [t]he nation's navigable waters have always been considered "public property" and since the early days of the nation have been under the exclusive control of the federal government under the Commerce Clause. Gilman v. Philadelphia, 70 U.S. (3 Wall.) 713, 724-25, 18 L.Ed. 96 (1866); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1864).[20]
 
 
 24
 Because the navigational servitude of the United States encompasses "the entire stream and the stream bed below ordinary high-water mark,"[21] the location of the "bed" of the Tombigbee River, and specifically the river's "ordinary high water mark" are crucial to our determination whether appellants have a right of public access to Lewis Creek. If the navigational servitude of the Tombigbee River, as a "navigable waterbody,"[22] encompasses Lewis Creek, Lewis Creek is public property and appellants may, subject to state law, have a right of public access. Thus, the location of the Tombigbee River's "ordinary high water mark" is the focus of our inquiry here.
 
 
 25
 Section 329.11(a)(1) of the regulations defines the ordinary high water mark" of non-tidal rivers as
 
 
 26
 the line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank; shelving; changes in the character of soil; destruction of terrestrial vegetation; the presence of litter and debris; or other appropriate means that consider the characteristics of the surrounding areas.[23]
 
 
 27
 The meaning of "ordinary high water mark," however, must be read within the definitional limits set forth by the federal courts. The Supreme Court has held that the "bed" of a navigable river does not include land covered by the "extraordinary freshets of the winter or spring, or the extreme droughts of the summer or autumn."[24] Neither does the bed of the river include the "lateral valleys which have the characteristics of relatively fast land, and usually are covered by upland grasses and vegetation, although temporarily overflowed in exceptional instances when the river is at flood."[25] Other expressions of the concept of "ordinary high water mark" have been summarized by the court in United States v. Cameron:The ordinary high water line has, for example, been defined as the line where the water stands sufficiently long to destroy vegetation below it. Goose Creek Hunting Club, Inc. v. United States, 518 F.2d 579, 583, 207 Ct.Cl. 323 (1975); Kelley's Creek and Northwestern R.R. v. United States, 100 Ct.Cl. 396, 406 (1943).
 
 
 28
 It has also been said to be the line which diverts [sic] upland from the river bed, the river bed being the "land upon which the action of the water has been so constant as to destroy vegetation." United States v. Chicago B & Q R. Co., 90 F.2d 161, 170 (7th Cir.1937). Another Court has defined the mark as "a natural physical characteristic placed upon the lands by the action of the river." U.S. v. Claridge, 279 F.Supp. 87 (D.Ariz.1966), aff'd, 416 F.2d 933 (9th Cir.), cert. denied, 397 U.S. 961, 90 S.Ct. 994, 25 L.Ed.2d 253 (1969). The Court in Harrison v. Fite, 148 F. 781 (8th Cir.1906), defined the ordinary high water line as the line below which the soil is so usually covered by water that it is wrested from vegetation and its value for agricultural purposes destroyed. The Third Circuit similarly defined the term as the line below which the waters have so visibly asserted their dominion that terrestrial plant life ceases to grow and, therefore, the value for agricultural purposes is destroyed. See Borough of Ford City v. United States, 345 F.2d 645, 648 (3d Cir.), cert. denied, 382 U.S. 902, 86 S.Ct. 236, 15 L.Ed.2d 156 (1965).[26]
 
 
 29
 The district court found that the Tombigbee floods and their duration and extent "are unpredictable except that they generally occur, if they do at all, during the winter, or wet months, December through March."[27] These floods may last as briefly as a few days before receding and returning to within the banks and bed of the Tombigbee. When flooding occurs, "the Tombigbee flood waters back up through these adjacent riverbottom lands, and depending on their volume and duration, can flood the area around Lewis Creek, approximately three miles from the banks of the Tombigbee."[28] Navigation on Lewis Creek during this flooding, even by small outboard motor boats, however, is not possible more than 25% of any year and, even then, is temporary and unpredictable. Moreover, the court noted that "the evidence is uncontroverted that the waters of the Tombigbee River have not occupied the lowland bottomland area abutting Lewis Creek long enough to destroy all terrestrial plant life and render the land valueless for agricultural purposes."[29] The riverbottom of Lewis Creek "is covered with grasses, trees and other terrestrial vegetation."[30] The land in the immediately surrounding area is used for raising cattle and hogs, for harvesting timber, and for hunting.
 
 
 30
 Because we hold that these findings of fact by the district court are not clearly erroneous, appellants' challenge must fall. On the application of law to those facts, we hold that, under the circumstances of this case, the district court properly considered the effect of the high waters of the Tombigbee upon surrounding vegetation in determining the location of the "ordinary high water mark." Flood marks resulting, as the district court found, from temporary and unpredictable flood waters occurring during the "ordinary freshets of the winter or spring"[31] are insufficient to establish the ordinary high water mark. In reaching this conclusion, we acknowledge that the ordinary high water mark of non-tidal rivers is not the elevation reached by flood waters; rather, it is "the line to which high water ordinarily reaches."[32] Thus, what courts have been interested in is evidence, such as a change in terrestrial vegetation, indicating the relatively permanent elevation of the water.[33] Debris and litter left from temporary and unpredictable floodwaters, unlike that left from ordinary high water, is not evidence of the river's ordinary high water mark.
 
 
 31
 The government, in its briefs, argues that, pursuant to the regulations, specifically section 329.11(a), the government's navigational servitude extends
 
 
 32
 laterally over the entire area covered by the ordinary high waters of the stream, including tributaries that might not otherwise be considered navigable and areas adjacent to the low water channel that revert to a swampy or even a dry condition as the waters recede.[34]
 
 
 33
 We reject any attempt by the Corps to extend so liberally the reach of its regulations and of its regulatory jurisdiction. The definition of "ordinary high water mark" advanced by appellants would extend the regulatory jurisdiction of the United States to farmland and hardwood forests in these bottomlands simply because the Tombigbee River periodically floods its banks during the winter and spring wet months. To argue that the government's jurisdiction should extend laterally as much as three miles on either side of the Tombigbee river is ludicrous. Appellants' definition, as the district court noted, "would recognize no horizontal limits to the "bed" of a navigable river in those areas where the banks are relatively low and flat...."[35] As one federal court of appeals recently noted,
 
 
 34
 There must ... be horizontal limits to the 'bed' of a river; otherwise, the navigational servitude would extend indefinitely in all directions and swallow up any claim for 'just compensation' under the Fifth Amendment for damages occurring anywhere below the elevation of the high-water mark.[36]
 
 
 35
 And, while the government emphasizes the necessity of their exercise of jurisdiction over properties adjacent to navigable rivers,[37] it is clear, as amicus Coastal Land Trust notes, that the Corps does have substantial regulatory power in these areas under section 404 of the Clean Water Act.[38]
 
 
 36
 Finally, appellants argue that the July 30, 1984 letter from the Corps of Engineers to Appellant Gollatte, as a determination of navigability, is entitled to "substantial weight" pursuant to 33 C.F.R. Sec. 329.14.[39] However, as the district court noted, this letter "falls far short of a determination of navigability required by 33 C.F.R. Sec. 329.14."[40] We agree and, on this basis, reject any suggestion that this letter is entitled to substantial weight.
 
 
 37
 Because appellants have failed to meet their burden of proof in establishing that Lewis Creek is below the "ordinary high water mark," we conclude that the district court correctly determined that Lewis Creek is not within the "bed" of the Tombigbee River. On this basis, we hold that Lewis Creek is not subject to the government's navigational servitude.
 
 
 38
 C. Alabama Law Regarding Right of Public Access.
 
 
 39
 Having determined that Lewis Creek is not navigable in fact and is not subject to the navigational servitude of the United States, we are left only with the question whether appellants, nevertheless, have a right of public access to Lewis Creek during periods when the Tombigbee floods its banks.
 
 
 40
 Appellants rely on Section 9-11-80(a) of the Alabama code to argue that even if Lewis Creek is not navigable, the law of Alabama grants the public a right of access to the waters of Lewis Creek. That section provides that "[a]ll waters of this state are hereby declared to be public waters if such waters are natural bodies of waters ... and if these waters traverse, bound, flow upon or through or touch lands title to which is held by more than one person, firm, or corporation."[41]
 
 
 41
 While, it is clear that Alabama law controls the question of access in this case,[42] it also is clear that section 9-11-80(a) applies only to navigable waters. The Alabama Supreme Court, in Hood v. Murphy,[43] held that the State does not own the "bed and bottom" of non-navigable streams; thus, notwithstanding section 9-11-80(a), the public has "no right of fishery in the waters as they go through such land."[44] Simply stated, the state does not own non-navigable waters, and the public has no right of access. Thus, because Lewis Creek is non-navigable, appellants have no right of access.
 
 III. Conclusion
 
 42
 For the foregoing reasons, we AFFIRM the decision of the district court.
 
 
 
 [1]
 33 U.S.C. Sec. 403 provides:
 The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.
 
 
 [2]
 United States v. Wilson, 894 F.2d 1245, 1254 (11th Cir.), cert. denied sub nom. Levine v. United States, --- U.S. ----, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990)
 
 
 [3]
 District Court, at 5-6
 
 
 [4]
 311 U.S. 377, 406 & n. 19, 61 S.Ct. 291, 298 & n. 19, 85 L.Ed.2d 243 (1940)
 
 
 [5]
 Id. at 408, 61 S.Ct. at 299
 
 
 [6]
 The Daniel Ball, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870)
 
 
 [7]
 33 C.F.R. Sec. 329.4. In defining "navigable waters of the United States," the Corps' regulations further provide,
 [a] waterbody which was navigable in its natural or improved state, or which was susceptible of reasonable improvement (as discussed in Sec. 329.8(b) of this Part) retains its character as "navigable in law" even though it is not presently used for commerce, or is presently incapable of use because of changed conditions or the presence of obstructions.
 
 
 [33]
 C.F.R. Sec. 329.9(a). And, "[n]avigability also may be found in a waterbody's susceptibility for use in its ordinary condition or by reasonable improvement to transport interstate commerce." Id. at Sec. 329.9(b). Plaintiffs offered no proof regarding the susceptibility of Lewis Creek, with reasonable improvements, to becoming navigable
 
 
 [8]
 Economy Light and Power Co. v. United States, 256 U.S. 113, 122, 41 S.Ct. 409, 412, 65 L.Ed. 847 (1921)
 
 
 [9]
 District Court, at 12 (quoting United States v. Utah, 283 U.S. 64, 87, 51 S.Ct. 438, 445, 75 L.Ed. 844 (1931))
 
 
 [10]
 District Court, at 14-15
 
 
 [11]
 District Court, at 15
 
 
 [12]
 United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 698, 19 S.Ct. 770, 773, 43 L.Ed. 1136 (1899)
 
 
 [13]
 Utah v. United States, 403 U.S. 9, 10, 91 S.Ct. 1775, 1776, 29 L.Ed.2d 279 (1971)
 
 
 [14]
 33 C.F.R. Sec. 329.3
 
 
 [15]
 389 U.S. 121, 123, 88 S.Ct. 265, 267, 19 L.Ed.2d 329 (1967)
 
 
 [16]
 Id. at Sec. 329.11(a)
 
 
 [17]
 Goose Creek Hunting Club, Inc. v. United States, 518 F.2d 579, 583, 207 Ct.Cl. 323 (1975); see also Swanson v. United States, 789 F.2d 1368, 1371 (9th Cir.1986)
 
 
 [18]
 Oklahoma v. Texas, 260 U.S. 606, 632, 43 S.Ct. 221, 224, 67 L.Ed. 428 (1923)
 
 
 [19]
 See 33 C.F.R. Sec. 209.260(j)(i) (1977)
 
 
 [20]
 Owen v. United States, 851 F.2d 1404 (Fed.Cir.1988)
 
 
 [21]
 Rands, 389 U.S. at 123, 88 S.Ct. at 267
 
 
 [22]
 33 C.F.R. Sec. 329.11(a)
 
 
 [23]
 33 C.F.R. Sec. 329.11(a)(1)
 
 
 [24]
 United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad, 312 U.S. 592, 596, 61 S.Ct. 772, 775, 85 L.Ed. 1064 (1941) (quoting Alabama v. Georgia, 64 U.S. (23 How.) 505, 515, 16 L.Ed. 556 (1860)); see also United States v. Claridge, 416 F.2d 933, 934 (9th Cir.1970) (ordinary high water mark does not extend to peak flow or flood stage so as to include overflow on flood plain)
 
 
 [25]
 Oklahoma v. Texas, 260 U.S. 606, 632, 43 S.Ct. 221, 224, 67 L.Ed. 428 (1923)
 
 
 [26]
 466 F.Supp. 1099, 1111 (M.D.Fla.1978)
 
 
 [27]
 District Court, at 7
 
 
 [28]
 District Court, at 7
 
 
 [29]
 District Court, at 20
 
 
 [30]
 Id
 
 
 [31]
 Chicago, Milwaukee, St. Paul & Pacific R.R., 312 U.S. at 596, 61 S.Ct. at 775 (quoting Alabama v. Georgia, 64 U.S. at 515)
 
 
 [32]
 State v. Sorenson, 222 Iowa 1248, 271 N.W. 234, 326 (1937) (quoting Cedar Rapids v. Marshall, 199 Iowa 1262, 203 N.W. 932, 933 (1925))
 
 
 [33]
 See, e.g., Howard v. Ingersoll, 54 U.S. (13 How.) 381, 14 L.Ed. 189 (1851); Borough of Ford City v. United States, 345 F.2d 645 (3d Cir.), cert. denied, 382 U.S. 902, 86 S.Ct. 236, 15 L.Ed.2d 156 (1965); Harrison v. Fite, 148 F. 781 (8th Cir.1906); Zunamon (Simon), Chicago Mill & Lumber Co., 227 Ct.Cl. 605 (1981); Kelley's Creek & Northwestern Ry. Co. v. United States, 100 Ct.Cl. 396 (1943)
 
 
 [34]
 Brief for the United States and the United States Corps of Engineers, at 27 (emphasis added)
 
 
 [35]
 District Court, at 20
 
 
 [36]
 Owen v. United States, 851 F.2d 1404, 1410 (Fed.Cir.1988). In that case, the Corp of Engineers argued that it was within its authority as owner of the dominant navigational servitude to intentionally redirect the course of the Tombigbee River to undercut an adjoining landowner's property, resulting in the landowner's farm collapsing into the river due to lack of lateral support. The court of appeals held that the navigational servitude did not extend to existing fast lands
 
 
 [37]
 The Corps notes that "[a]lthough the Corps' present concern is with the extent of its authority under the Rivers and Harbors Act, whether the public has access to this area will determine whether the Corps can initiate projects affecting the area without having to pay compensation under the Fifth Amendment." Brief for the United States and the United States Corps of Engineers, at 42
 
 
 [38]
 33 U.S.C. Sec. 1344. For example, the regulations defining "waters of the United States" under the Clean Water Act specifically provide that such areas include "non-navigable" intrastate waters whose use or misuse could affect interstate commerce." 40 Fed.Reg. 31320 (1975)
 
 
 [39]
 Section 329.14(a) provides in pertinent part: "Although conclusive determinations of navigability can be made only by federal Courts, those made by federal agencies are nevertheless accorded substantial weight by the courts."
 
 
 [40]
 District Court, at 8. 33 C.F.R. Sec. 329.14(b) sets out in detail the procedure to be followed in making a determination whether a waterbody is navigable
 
 
 [41]
 Ala.Code Sec. 9-11-80(a)
 
 
 [42]
 See, District Court, at 22-23
 
 
 [43]
 231 Ala. 408, 165 So. 219 (1936)
 
 
 [44]
 Id. at 408, 165 So. at 220