STUART, Justice.
The City of Irondale appeals the summary judgment entered by the Jefferson Circuit Court declaring invalid Irondale’s annexation of a parcel of property owned by the Black Warrior-Cahaba Rivers Land Trust (“the Land Trust”) adjacent to the Cahaba River at the point the Cahaba River intersects U.S. Highway 78, also known as Bankhead Highway, in Jefferson County (this property is hereinafter referred to as “the Land Trust property”). We affirm.
I.
On December 9, 2006, Jefferson County conveyed multiple parcels of property it owned along the Black Warrior River and the Cahaba River to the Land Trust, which covenanted to preserve and protect in perpetuity the water quality and habitat values of the property, which were declared in the deeds conveying the property to be “of great importance to [Jefferson County], the people of Jefferson County and the people of the State of Alabama.” Included in those parcels of property was the Land Trust property. On July 6, 2010, the Land Trust petitioned Irondale to annex the Land Trust property, which at that time did not lie within the corporate limits of any municipality, but fell within the police jurisdiction of both the City of Irondale and the City of Leeds.[1] The Irondale City Council thereafter voted to grant the petition for annexation and, in August and September 2010, adopted a series of four ordinances annexing the property pursuant to § 11-42-20 et seq., Ala.Code 1975, the statutes governing annexation by municipalities having 2,000 inhabitants or more.
On April 29, 2011, the City of Leeds filed an action in the Jefferson Circuit Court, seeking a judgment declaring invalid the annexation of the Land Trust property and declaring the corporate limits of the City of Irondale to be the same as they were before the adoption of the annexing ordinances. Leeds argued that the Land Trust property was “not contiguous to any part of the corporate limits of Irondale” and that its annexation by Irondale was therefore improper because § 11-42-21, Ala.Code 1975, authorizes annexation by petition only when the subject property is “contiguous to the corporate limits” of the annexing municipality. See Fort Morgan Civic Ass’n v. City of Gulf Shores, 100 So.3d 1042, 1047 (Ala.2012) (“Annexation by petition is governed by § 11-42-21, Ala. Code 1975, which requires only that the annexed land be ‘contiguous to the corporate limits’ of the annexing municipality.”).
On October 10, 2011, Irondale moved the trial court to enter a summary judgment in its favor, arguing that contiguity existed between the Land Trust property and property within the Irondale corporate limits, specifically along the east side of the Land Trust property where Iron-dale alleged there was contiguity in the center of the Cahaba River. On January 20, 2012, Leeds filed its own summary-judgment motion, arguing that the Land Trust property was separated from the corporate limits of Irondale by the Cahaba River, which Leeds alleged was a public *1246 waterway, and that a finding of contiguity across that waterway was inappropriate in light of this Court’s decisions in City of Spanish Fort v. City of Daphne, 774 So.2d 567 (Ala.2000), City of Madison v. City of Huntsville, 555 So.2d 755 (Ala.1989), and Johnson v. Rice, 551 So.2d 940 (Ala.1989), cases in which this Court considered the circumstances in which the contiguity requirement of § 11-42-21 could be met notwithstanding the existence of a public waterway between the property to be annexed and the corporate limits' óf the municipality desiring the annexation. Leeds also argued that Irondale’s annexation of the Land Trust property would adversely affect the proper and efficient functioning of the Leeds city government.
On February 10, 2012, the parties filed responses to each other’s summary-judgment motions. At a hearing on those motions, the trial court ordered additional briefing from the parties addressing the question whether the Cahaba River was, in fact, a public waterway. On March 30, 2012, Leeds submitted a brief and eviden-tiary materials supporting its position that the Cahaba River was a public waterway because, Leeds alleged, the stretch of the Cahaba River at issue was navigable both in law and in fact. See, e.g., Ala. Const. 1901, Art. I, § 24 (“[A]ll navigable waters shall remain forever public highways, free to the citizens of the state and the United States, without tax, impost, or toll.... ”), and § 83-7-1, Ala.Code 1975 (“All navigable waters in this state are public thoroughfares.”). Irondale subsequently filed a response, arguing that the Cahaba River was not a public waterway because the deed conveying the Land Trust property to the Land Trust clearly indicated that the Land Trust owned the bed and bottom of the river up to its center and the State could not, therefore, simultaneously own that bed and bottom. Irondale further argued that the stretch of the Cahaba River at issue was not navigable under the federal test of navigability, which test, Ir-ondale argued, was the only test that mattered. Evidence of individual opinions or state determinations of the navigability question were, Irondale argued, irrelevant. See United States v. State of Oregon, 295 U.S. 1, 14, 55 S.Ct. 610, 79 L.Ed. 1267 (1935) (“[T]he question, whether the waters within the state under which the lands lie are navigable or nonnavigable, is a federal, not a local, one. It is, therefore, to be determined according to the law and usages recognized and applied in the federal courts.... ”).
On June 6, 2012, the trial court ruled on the parties’ summary-judgment motions, granting the motion filed by Leeds and denying the motion filed by Irondale. In entering a summary judgment in favor of Leeds, the trial court concluded that “the Cahaba River, under Alabama state law, is a public waterway” and that the conditions for finding contiguity across a public waterway were not met. Accordingly, the trial court concluded, Irondale’s annexation of the Land Trust property was improper and void. On July 3, 2012, Iron-dale filed a timely notice of appeal to this Court.
II.
Irondale argues that the trial court erred in entering a summary judgment in favor of Leeds. We review this argument pursuant to the following standard:
“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is *1247 entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12.”
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004).
III.
The trial court correctly identified the primary issue in this case: Whether the Cahaba River is a public waterway at the point it separates the Land Trust property from property within the corporate limits of Irondale. On appeal, Irondale emphasizes the fact that the deed conveying the Land Trust property to the Land Trust states on its face that the Land Trust owns the property to the center of the Cahaba River and argues essentially that this fact (1) forecloses a finding that the Cahaba River is a public waterway and (2) obviates the need to consider whether the Cahaba River is a public waterway because, even if it is, there is nevertheless contiguity between the Land Trust property and property in the corporate limits of Irondale where those properties meet in the bed at the center of the Cahaba River. In Johnson, however, this Court stated:
“ Annexation across a public waterway, in many respects, is substantially similar to annexation across a public road. The question is: “What did the legislature mean and intend when requiring that the parcel to be annexed be contiguous to the existing city limits?” Our Supreme Court, in answering that question, has said that two parcels of land are contiguous, within the meaning and intent of the legislature, if they lie on opposite sides of a public road. This finding does not, and should not, turn on an exhaustive analysis of who owns the underlying fee to, or who has rever-sionary rights to, the road right-of-way, or any similar principles of real estate law. Rather, the basis for this interpretation rests most comfortably upon a common sense recognition and understanding of what is necessary for the proper and efficient functioning of city government.’ ”
551 So.2d at 944 (quoting order of the trial court; emphasis added). Thus, in Johnson this Court recognized that whether there is contiguity between properties separated by a public road does not hinge on who owns the land underlying the public road; rather, common-sense principles should be applied. Similarly, if we hold the Cahaba River to be a public waterway in this case, we will apply the principles developed by this Court in Johnson, City of Madison, and City of Spanish Fort, and not base our conclusion on an analysis “of who owns the underlying fee to, or who has reversionary rights to, the [water] right-of-way, or any similar principles of real estate law.” Johnson, 551 So.2d at 944. For this reason, we need not be concerned with whether the Land Trust and the adjacent property owner own the bed and bottom of the Cahaba River, as Irondale argues, or whether the State is its true owner, as Leeds argues. Rather, we must first determine whether, in fact, the Cahaba River is a public waterway.
Irondale argues that the Cahaba River is not a public waterway because it does not meet the federal test for navigability. *1248 Leeds counters by arguing that it is unnecessary to apply the federal test of navigability in light of the other evidence indicating that the Cahaba River is navigable and is a public waterway. However, Leeds argues, if this Court does apply the federal test for-navigability, the only reasonable conclusion is that the Cahaba River is navigable and is therefore a public waterway.
In Wehby v. Turpin, 710 So.2d 1248 (Ala.1998), this Court considered whether individual property owners owning part of a lake bed had a right to use the entire man-made lake or just the surface waters covering their property. Among the arguments made by the property owners seeking the use of the entire lake was the argument that the lake was “public waters” because Yellowleaf Creek, which they alleged to be a navigable stream, flowed into the lake. 710 So.2d at 1249-50. See § 9-11-80(a), Ala.Code 1975 (stating in part that “[a]ny water impounded by the construction of any lock or dam or other impounding device placed across the-channel of a navigable stream is declared a public water”). In considering whether Yellowleaf Creek was navigable, this Court first applied the federal test of navigability set forth in The Daniel Ball, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870):
“Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.”
Applying this test, the Court ultimately concluded that there was no evidence indicating that Yellowleaf Creek was navigable under the federal test. 710 So.2d at 1250. However, the Court did not end its inquiry there, instead continuing on to consider whether Yellowleaf Creek was “navigable in law”:
“A stream is navigable in law if it has an aptitude for beneficial public servitude, capable of being traversed for valuable floatage for a considerable part of the year. Rhodes v. Otis, 33 Ala. 578, 597-98 (1859). Proof of occasional use by ‘fishing boats’ and ‘canoes’ during some parts of the year is not sufficient to demonstrate that Yellowleaf Creek is capable of any beneficial public use. Therefore, we hold that Yellowleaf Creek and, necessarily, [the man-made lake into which it flows], are, as a matter of law, not navigable waterways.”
710 So.2d at 1250. Thus, it is apparent that the Wehby Court did not rely exclusively upon the federal navigability test to decide the issue but, instead, considered other factors — namely, whether the waterway “has an aptitude for beneficial public servitude, capable of being traversed for valuable floatage for a considerable part of the year.” Id. An examination of the purpose of the federal navigability test makes it clear that this Court violated no legal principles by looking beyond that test in the context of Wehby.
As Irondale emphasizes, there is extensive caselaw indicating that the question of navigability is generally a federal question. See, e.g., United States v. State of Oregon, 295 U.S. at 14 (quoted supra), and United States v. Harrell, 926 F.2d 1036, 1040 (11th Cir.1991) (“The question of navigability ... is a federal question and has been defined by decisions of the federal courts.”). This Court even recognized this principle in Wehby, stating: “[t]he Federal Government- has paramount authority respecting navigation; therefore, the test of navigability is a federal question.” 710 So.2d at 1250. However, other caselaw *1249 makes clear that this is true only when the issue before the court is of a constitutional nature. See, e.g., United States v. Holt State Bank, 270 U.S. 49, 55-56, 46 S.Ct. 197, 70 L.Ed. 465 (1926) (“Navigability, when asserted as the basis of a right arising under the Constitution of the United States, is necessarily a question of federal law to be determined according to the general rule recognized and applied in the federal courts.” (emphasis added)). As explained by the Arizona Court of Appeals in Defenders of Wildlife v. Hull:
“A federal determination of ‘navigability’ may serve many different purposes, the three most typical being: to confer admiralty jurisdiction, to define Congress’ reach under the commerce power, and to grant title under the equal footing doctrine. See State of Alaska v. United States, 563 F.Supp. 1223, 1225 n. 3 (D.Alaska 1983). In addition to the federal tests, states have also adopted a variety of navigability definitions to satisfy different policies regarding resource conservation, apportionment of waterways between private and public uses, and protection of public access to waterways. No aspect of the federal test of navigability used to determine title under the equal footing doctrine precludes the various states from adopting more liberal tests in order to advance other important interests or public uses. See Hitchings v. Del Rio Woods Recreation and Park Dist., 55 Cal.App.3d 560, 127 Cal.Rptr. 830, 834 (1976) (‘for purposes of public use of waters, the state may adopt different and less stringent tests of navigability’).
“Because of the variant circumstances in which navigability is raised, the cases interpreting navigability ‘cannot be “simply lumped into one basket.” ’ Boone v. United States, 944 F.2d 1489, 1499 (9th Cir.1991) (quoting Kaiser Aet-na v. United States, 444 U.S. 164, 170, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)); see also Glenn J. MacGrady, The Navigability Concept in the Civil and Common Law, 3 Fla. St. U.L.Rev. 511, 515 (1975). Indeed, when discussing navigability, any reliance on judicial precedent should be predicated on a careful appraisal of the purpose for which the concept of navigability is invoked. See id.”
199 Ariz. 411, 418-19, 18 P.3d 722, 729-30 (Ariz.Ct.App.2001) (footnotes omitted).
In the instant case, the issue before this Court is whether the section of the Cahaba River in question should be considered a public waterway for annexation purposes. The organization and boundaries of municipalities within this State is a state issue, not a federal constitutional issue. Accordingly, we are not bound by the federal test of navigability in determining whether the Cahaba River is a public waterway; we may instead consider other factors.
In Wehby, this Court indicated that it would find a stream to be navigable “if it has an aptitude for beneficial public servitude, capable of being traversed for valuable floatage for a considerable part of the year.” 710 So.2d. at 1250 (citing Rhodes v. Otis, 33 Ala. 578, 597-98 (1859)). In Rhodes, this Court stated:
“From the somewhat conflicting authorities which we have examined, we attain the conclusion, that in determining the character of a stream, inquiry should be made as to the following points: whether it is fitted for valuable floatage; whether the public, or only a few individuals, are interested in transportation; whether any great public interests are involved in the use of it for transportation; whether the periods of its capacity for floatage are sufficiently *1250 long to make it susceptible of use benefi-dally to the public; whether it has been previously used by the people generally, and how long it has been so used; whether it was meandered by the government surveyors, or included in the surveys; whether, if declared public, it will probably in future be of public use for carriage.”
33 Ala. at 596-97. Leeds has submitted evidence indicating that this stretch of the Cahaba River is used and capable of use by the public, that it is navigable at least by canoe year-round, and that it is “meandered” on government survey maps maintained by the Secretary of State.[2] We additionally note that Irondale’s stated reason for annexing the Land Trust property was to construct a public canoe launch and that the deed conveying the Land Trust property from Jefferson County to the Land Trust indicated on its face that the water quality and habitat values of the property were “of great- importance to [Jefferson County], the people of Jefferson County and the people of the State of Alabama.” Finally, Leeds has also submitted evidence indicating that the Alabama Department of Conservation and Natural Resources has determined this stretch of the Cahaba River to be navigable. These facts all indicate that the Ca-haba River at the site in question is, in fact, a public waterway.
Irondale’s argument to the contrary is focused entirely on the federal definition of navigability and Irondale’s assertion that there is no evidence indicating that the Cahaba River, at the point in question, is used or capable of any commercial — as opposed to merely recreational — use. See The Daniel Ball, 77 U.S. (10 Wall.) at 563. However, as explained supra, we are not required to apply the federal navigability test when making a navigability determination in this case because no constitutional issue is being presented. See also Montana Coalition for Stream Access, Inc. v. Curran, 210 Mont. 38, 51, 682 P.2d 163, 170 (1984) (“Navigability for use is a matter governed by state law. It is a separate concept from the federal question of determining navigability for title purposes.”). Accordingly, we are free to apply a less stringent test, and, doing so, we conclude that the Cahaba River at the point where it borders the Land Trust property is navigable because it has an aptitude for beneficial public use, even if that use is merely recreational as opposed to commercial. Irondale has submitted no evidence that would create a genuine issue of material fact on this point. See also People ex rel. Baker v. Mack, 19 Cal.App.3d 1040, 1046, 97 Cal.Rptr. 448, 451 (1971) (stating that “[t]he modern tendency in several other states, as well as here, [is] to hold for use of the public any stream capable of being used for recreational purposes”), and State v. Korrer, 127 Minn. 60, 63, 148 N.W. 617, 618 (1914) (“It is not necessary that the water should be capable of commerce of pecuniary value. If a body of water is adapted to use for public purposes other than commercial navigation it is held to be public water, or navigable water, if the old nomenclature is preferred. Boating for pleasure is considered navigation, as well as boating for mere pecuniary profit.”).[3]
*1251 Having established that the Cahaba River is a public waterway, we must next consider whether Irondale’s annexation of property across that public waterway from its corporate limits was appropriate. In City of Spanish Fort, we stated:
“This Court has ... recognized that some annexations across public waterways may also meet the contiguity requirement of the statute, although we find only two Alabama cases discussing this issue: City of Madison v. City of Huntsville, 555 So.2d 755 (Ala.1989), and Johnson v. Rice, supra. In those cases, both decided in 1989, this Court approved annexations by the City of Gun-tersville across Lake Guntersville and by the City of Decatur across Wheeler Lake. (City of Madison v. City of Huntsville involved not only the two cities named in the style, but also Limestone County and the cities of Decatur and Athens.) In Johnson, the Court analogized the analysis to be applied when considering annexations across a body of water to the analysis to be applied when considering annexations across a public roadway. We reaffirm that analogy.
[[Image here]]
“In Johnson v. Rice, the City of Gun-tersville purported to annex territory directly across Lake Guntersville from the then existing city limits. This Court quoted at length the findings of fact, conclusions of law, and judgment of the trial court and ‘found no reason for reversing’ the trial court’s judgment. See 551 So.2d at 946. The trial court concluded that the annexation met the contiguity requirement because of the presence of a number of specific factors:
“ ‘ “In reaching this conclusion, we find essential facts to exist in this case with respect to the [property the City of Guntersville sought to annex] in relation to the existing city limits of Guntersville, and were it not for the presence of each and all these facts, our conclusion as to contiguity would be otherwise:
“ ‘ “a) But for the intervention of a public waterway (Guntersville Lake, owned and operated by the Tennessee Valley Authority, a public government entity) and the appurtenant lake-shore property rights owned by TVA (such as flooding rights), the [property sought to be *1252 annexed] would actually touch the existing city limits of Guntersville. “ ‘ “b) The [property sought to be annexed] lies directly across the public waterway from the existing city limits of Guntersville, and not diagonally across the waterway.
“ ‘ “c) There is a public road (including a bridge and approaches thereto) which crosses the public waterway and connects the existing city limits of Guntersville to the [property sought to be annexed], with no intervening landowners which abut said public road other than TVA. In other words, the bridge and approaches begin inside the City of Guntersville and cross the public waterway (Guntersville Lake), and the first private property owner on the other side of the lake which abuts the public road [owned the property sought to be annexed].
“ ‘ “d) Ordinance 592 annexes both the [property sought to be annexed] and the public road right-of-way which connects it to the city, so after the annexation it is not necessary to go outside of the city to reach the [property sought to be annexed].” ’
“551 So.2d at 945 (second emphasis added). In City of Madison v. City of Huntsville, this Court also approved Decatur’s annexation of property lying directly across Wheeler Lake from Decatur’s then existing corporate limits. Just as in Johnson, the annexation also included the public roadway running across the lake joining the newly annexed property to the then existing city limits.
“Applying the principles established in the cited cases to the facts of this case, we conclude that Daphne’s purported annexation of the causeway properties did not meet the § 11 — 42—21[, AIa.Code 1975,] requirement of contiguity, as that requirement has been explained by this Court. In its purported annexation of the causeway properties, Daphne did not attempt to annex the public roadways that might have allowed access from the then existing Daphne corporate limits to the properties to be annexed. The properties comprise several ‘pockets’ of territory that are surrounded on all sides by property Daphne did not attempt to annex. To reach by automobile any of the causeway properties Daphne purported to annex, one would have to travel outside Daphne and through areas that Daphne did not attempt to annex.
“The trial court found that all the causeway properties were contiguous to the city’s existing city limits because they touch ‘by land or by water.’ However, as explained above, there is no existing route by which the properties may be reached by automobile from the original Daphne boundaries without traveling outside the city; thus, this case is different from Johnson and City of Madison, where the annexing cities annexed public roadways leading directly from the existing boundaries of those cities to the property sought to be annexed.”
774 So.2d at 574-76. Considering the facts of this case in light of the four factors considered in City of Spanish Fort and Johnson, we must agree with the trial court that Irondale’s purported annexation of the Land Trust property does not meet the § 11^42-21 requirement of contiguity because it is impossible to travel by automobile from the annexing municipality (Ir-ondale) to the proposed annexed land without crossing into a neighboring municipality (Leeds).
*1253 Irondale argues that this Court should not base its decision on the four factors discussed in Johnson and City of Spanish Fort and that we should instead rely on “common sense.” See Johnson, 551 So.2d at 944 (explaining that the basis for the rule that two parcels of land on opposite sides of a public road are contiguous “rests most comfortably upon a common sense recognition and understanding of what is necessary for the proper and efficient functioning of city government” (emphasis added)). In truth, however, there is no distinction; the four factors discussed are really no more than formalized articulations of common sense. In Johnson, the Court explained that the rule holding that properties on opposite sides of a public road are contiguous for annexation purposes comports with common sense because both properties would have equal access to existing city services “such as police and fire protection, school bus routes, utility services, and similar functions of city government.” 551 So.2d at 944-45. By contrast, the evidence in this case indicates that the Land Trust property would be on the far edge of Irondale, isolated from the core of the city’s residential and commercial areas, and without access to existing city services offered by Irondale unless those services were routed through Leeds. Specifically, Leeds submitted affidavit testimony from a professional engineer describing the Land Trust property and the surrounding parcels and specifically stating that “[i]t is not possible to travel by automobile from any point within the City of Irondale to the Land Trust Property without leaving the City of Irondale and passing through the City of Leeds.” Indeed, the map prepared and submitted by that engineer establishes that the only road frontage the Land Trust property has is with U.S. Highway 78, which is itself within the City of Leeds, thus indicating that Irondale would be unable to provide city services of the type described in Johnson without first traveling through Leeds. Irondale’s annexation of the Land Trust property was accordingly invalid because of a lack of contiguity.
IV.
Irondale appealed the summary judgment entered in favor of Leeds, in which the trial court held that Irondale’s annexation of the Land Trust property was improper and void because of a lack of contiguity between the Land Trust property and property within the corporate limits of Irondale. Because the Land Trust property is separated from property within the corporate limits of Irondale by a public waterway and because the factors set forth in City of Spanish Fort and Johnson for finding contiguity across a public waterway are not present, that judgment is hereby affirmed.
AFFIRMED.
MOORE, C.J., and BOLIN, PARKER, and WISE, JJ., concur.

. Pursuant to § ll-40-10(a), Ala.Code 1975, the police jurisdiction in cities having 6,000 or more inhabitants extends three miles from the corporate limits.

. Unlike in Wehby, where the evidence indicated only that the stream in question was capable "of occasional use by ‘fishing boats' and ‘canoes’ during some parts of the year," 710 So.2d at 1250 (emphasis added), Leeds submitted affidavit testimony from two employees of the Cahaba River Society, each of whom claimed to have participated in over 500 canoe trips on the Cahaba River, stating that "[t]his portion of the Cahaba River in Jefferson County is navigable year-round.”

. In its reply brief, Irondale argues that a determination that this stretch of the Cahaba River is a public waterway would essentially *1251 constitute a taking of that portion of the Land Trust property that extends to the bed and bottom of the river. However, as explained supra, it is unnecessary for us to determine ownership of the Cahaba River bed, which Irondale argues belongs to the Land Trust, to determine the navigability issue, and we have expressed no opinion in that regard. The Land Trust has made no claim to the waters; thus, there has been no taking. Other courts to consider this argument have reached similar results. See, e.g., Ciaran, 210 Mont, at 53, 682 P.2d at 171 ("The counterclaim for inverse condemnation was based upon [the appellee's] claim to ownership of the riverbed .... However, the question of title to the bed is irrelevant to determination of navigability for use, and [the appellee] has no claim to the waters. Since there is no claim to the waters, there is no taking and, therefore, no grounds for an inverse condemnation claim.”), and Hitchings v. Del Rio Woods Recreation & Park Dist., 55 Cal.App.3d 560, 571, 127 Cal.Rptr. 830, 837 (1976) ("Respondents have devoted a substantial portion of their argument on appeal to the matter of title to the stream bed, asserting that a finding of navigability will result in a taking of private land. As in both the Bohn [v. Albertson, 107 Cal.App.2d 738, 749, 238 P.2d 128 (1951),] and Mack cases, however, the question of title to the bed of a navigable stream is not raised in this action to determine public use rights, nor is it relevant to the issues herein presented for decision.... The ownership of the bed is not determinative of public navigational rights, nor vice-versa.” (citations omitted)).